Jacqueline Ortiz **GONZALEZ,**
Plaintiff(s),

v.

**SEARS HOLDING COMPANY** a/k/a Sears Roebuck of Puerto Rico, Inc.; Melvin Fonseca; Melissa Negron, Defendant(s).

Civil No. 11–1468(DRD).

United States District Court,
D. Puerto Rico.

Oct. 15, 2013.

Judith Berkan, Mary Jo Mendez–Vilella, Berkan & Mendez, San Juan, PR, for Plaintiffs.

Anabel Rodriguez–Alonso, Mariela Rexach–Rexach, Rafael E. Aguilo–Velez, Shiara L. Dilone–Fernandez, Schuster & Aguilo, LLP, San Juan, PR, for Defendants.

## AMENDED OPINION AND ORDER NUNC PRO TUNC ADOPTING REPORT AND RECOMMENDATION

DANIEL R. DOMÍNGUEZ, District Judge.

Pending before the Court are: (a) *Defendant's Motion For Summary Judgment And Memorandum Of Law In Support Thereof,* Docket entries No. 35 and 36; (b) *Plaintiff's Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment,* Docket No. 51; (c) *Defendant's Reply to Opposition To Motion For Summary Judgment,* Docket No. 63; (d) *Report and Recommendation* issued by the Magistrate Judge Marcos E. López (hereinafter "Magistrate Judge"), Docket No. 77; (e) *Plaintiff's Objection to Report and Recommendation on Summary Judgment Request,* Docket No. 78; (f) *Opposition to Plaintiff's Objections to Magistrate Judge's Report and Recommendation,* Docket No. 82. The *Report and Recommendation* concluded that the federal claims under the Americans with Disability Act ("ADA"), including Puerto Rico Law No. 44, against defendants Melvin Fonseca and Melissa Negrón, be dismissed with prejudice, and the state law claims be dismissed without prejudice. *See* Docket No. 77, page 214.

The instant case was referred to the Magistrate Judge Marcos E. López (hereinafter "Magistrate Judge") for report and recommendation. *See* Docket entries No. 71 and 74. The Magistrate Judge entered the *Report and Recommendation* on August 30, 2013, Docket No. 77. Pursuant to the *Order Referring Case,* Docket No. 71, the parties were granted five business days to file any objections. The record shows that plaintiff timely opposed the *Report and Recommendation* on Septem-

ber 3, 2013, Docket No. 78. On September 10, 2013, the defendants filed their response to plaintiff's objections on a timely fashion and after requesting leave of Court. *See* Docket entries No. 81 and 82. For the reasons set forth below, the Magistrate Judge's *Report and Recommendation* is adopted *in toto,* as supplemented herein.

## Standard of Review

The District Court may refer dispositive motions to a United States Magistrate Judge for a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B) (1993); Rule 72(b) of the Federal Rules of Civil Procedure ("Fed. R. Civ.P."); Rule 72 of the Local Rules for the District of Puerto Rico ("Local Rules"). *See Mathews v. Weber,* 423 U.S. 261, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). As a general rule, an adversely affected party may contest the Magistrate Judge's report and recommendation by filing its objections within fourteen (14) days after being served a copy thereof. *See* Local Rule 72(d); Fed.R.Civ.P. 72(b). Moreover, 28 U.S.C. § 636(b)(1), in its pertinent part, provides that:

> Within fourteen days of being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

"The district judge need not normally conduct a new hearing and may consider the record developed before the magistrate judge, making his or her own determination on the basis if that record." *See* Local Rule 72(d) of December 3, 2009, as amended on September 2, 2010.

However, "[a]bsent objection by the plaintiffs, [a] district court ha[s] a right to assume that [a party] agree[s] to the magistrate's recommendation." *Templeman v. Chris Craft Corp.,* 770 F.2d 245, 247 (1st Cir.1985), *cert. denied,* 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985). Moreover, "[f]ailure to raise objections to the Report and Recommendation waives that party's right to review in the district court and those claims not preserved by such objection are precluded on appeal." *Davet v. Maccarone,* 973 F.2d 22, 30–31 (1st Cir.1992). *See also Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–151 (1st Cir.1994) (holding that specific objections are required when challenging findings actually set out in magistrate's recommendation, as well as magistrate's failure to make additional findings); *Lewry v. Town of Standish,* 984 F.2d 25, 27 (1st Cir.1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); *Keating v. Secretary of H.H.S.,* 848 F.2d 271, 275 (1st Cir.1988); *Borden v. Secretary of H.H.S.,* 836 F.2d 4, 6 (1st Cir.1987) (holding that appellant was entitled to a *de novo* review, "however he was not entitled to a *de novo* review of an argument never raised"). *See generally United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980). **Hence, the standard for review of an objected report and recommendation is *de novo* review of those matters properly objected.** *See Borden v. Secretary of H.H.S.,* 836 F.2d at 6. The Court, therefore proceeds, as the *Report and Recommendation* has been objected, to review the *Report and Recommendation* of the Magistrate Judge *de novo,* as to those parts that have been objected. *Borden v. Secretary of H.H.S., supra.*

### The Summary Judgment Standard

Generally, "[s]ummary judgment is proper where 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c)." *Richardson v. Friendly Ice Cream Corporation*, 594 F.3d 69, 74 (1st Cir.2010). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 324–325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Coca–Cola, Co.*, 522 F.3d 168, 175 (1st Cir.2008); *Rodríguez–Rivera, et al. v. Federico Trilla Regional Hospital of Carolina, et al.*, 532 F.3d 28, 30 (1st Cir.2008). "The object of summary judgment is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Dávila v. Corporación de Puerto Rico Para La Difusión Pública*, 498 F.3d 9, 12 (1st Cir.2007), citing from *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 7 (1st Cir.2004) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992)). In *Dávila*, the United States Court of Appeals for the First Circuit ("First Circuit") held:

> For this purpose, an issue is genuine if a reasonable jury could resolve the point in favor of the nonmoving party. *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000). By like token, a fact is material if it has the potential to determine the outcome of the litigation. *See Calvi v. Knox County*, 470 F.3d 422, 426 (1st Cir.2006). Where, as here, the nonmovant has the burden of proof and the evidence on one or more of the critical issues in the case "is ... not significantly probative, summary judgment may be granted." *Acosta*, 386 F.3d at 8 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

When reviewing *de novo*, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." *Noviello v. City of Boston*, 398 F.3d 76, 84 (1st Cir.2005), citing *Cox v. Hainey*, 391 F.3d 25, 27 (1st Cir.2004). *See also Richardson v. Friendly Ice Cream Corporation*, 594 F.3d at 74. "[T]he nonmovant bears 'the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe.'" *Noviello*, 398 F.3d at 84, citing *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir.2003). *See also, Dávila*, 498 F.3d 9. "Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, '[e]vidence that is inadmissible at trial, such as, inadmissible hearsay, may not be considered on summary judgment.'" *Noviello*, 398 F.3d at 84, citing *Vázquez v. López–Rosario*, 134 F.3d 28, 33 (1st Cir.1998); *accord Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). "The evidence presented by the non-moving party may not be 'conclusory allegations, improbable inferences, [or] unsupported speculation.'" *Torres–Negrón v. Merck & Company, Inc., et al.*, 488 F.3d at 39, citing *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). Based on these premises, the Court proceeds with the analysis.

### Analysis

### Factual and Procedural Background

The facts in this case are straightforward. Plaintiff Jacqueline Ortiz Santiago (hereinafter "Ortiz" or "plaintiff") alleges in the *Complaint* several employment violations under the American with Disabilities Act ("ADA"), such as, "illegal and discriminatory actions taken by the employer on the basis of her disability," "questioning her need for reasonable accommodation, and retaliated against her when she requested the Company to com-

ply with the law," 42 U.S.C. §§ 12101 *et seq.*, and constructive discharge. *See Complaint*, Docket No. 1, page 1. Ms. Ortiz seeks a declaratory and injunctive relief enjoining the defendants from engaging in practices of disability discrimination, as well as damages against her former employer, defendant Sears Holdings a/k/s Sears Roebuck de Puerto Rico, Inc. (hereinafter "Sears"). Plaintiff is also seeking reinstatement to her prior position or in the alternative, "front pay and related benefits in lieu of reinstatement." *See Complaint*, Docket No. 1, page 9. In addition, plaintiff' seeks compensatory damages, lost wages and benefits, past and future, as well as attorneys fees and costs.

Plaintiff was hired as a part-time employee in the year 2005. On April 5, 2010, plaintiff voluntarily quit her job. Ms. Ortiz was hired as a sales associate in the Sears' store located at the Santa Rosa Mall in Bayamón. *See* Docket No. 1 ¶ 4.5. Plaintiff alleges that she is disabled under the ADA, as she suffers from Type I diabetes and high blood pressure, "conditions which substantially limit her ability to engage in one or more major life functions." *Id.* ¶ 4.2. "Since the beginning of her employment, plaintiff requested reasonable accommodation for her disability." *Id.* ¶ 4.6. Late in the year 2008, plaintiff was transferred to the Sears outlet located at Los Paseos, as an assistant to the Office Supervisor in the administrative office. *Id.* ¶ 4.7. It appears that the Office Supervisor was transferred to another store in August 2009, and plaintiff performed the functions of the Office Supervisor on a temporary basis until a person be designated to occupy the position. *Id.* ¶ 4.8. Plaintiff applied for the position of Office Supervisor, however, defendant Melissa Negrón ("Ms. Negrón") was hired in December 2009 for the position, notwithstanding plaintiff that her "formal and informal evaluations were always sat-

isfactory." *Id.* ¶¶ 4.9 and 4.11. Plaintiff trained Ms. Negrón in the new position. *Id.* ¶ 4.12. Plaintiff alleges that after the training, Ms. Negrón "began a pattern of harassing Ms. Ortiz due to plaintiff's needs for reasonable accommodation." *Id.* ¶ 4.14.

Plaintiff further alleges that Ms. Negrón and the operations manager Mr. Fonseca, "refus[ed] to pay plaintiff' sick time when she was out of the workplace due to her disability." *Id.* ¶ 4.14(e). Both Ms. Negrón and Mr. Fonseca, the operations manager, began to assign "excess work" to plaintiff, refused to allow her sufficient time to complete the assigned tasks, and even reduced her work hours. *Id.* ¶ 4.15.

"On April 5, 2010, shortly before plaintiff's scheduled meal break, Ms. Negrón and Mr. Fonseca ordered plaintiff to perform a certain task. While performing the assignment plaintiff felt ill and requested Mr. Fonseca to allow her to take her meal break." *Id.* ¶ 4.19. "In response to plaintiff's request, Mr. Fonseca not only prohibited her from taking the required meal break, but also humiliated plaintiff and told her that she was worthless in front of other employees." *Id.* ¶ 4.20. "Ms. Ortiz felt the need to demonstrate to Mr. Fonseca her entitlement to the break by showing the supervisor medical certificates in her personnel file documenting her disability and the need for reasonable accommodation." *Id.* at page 6, ¶ 4.21. "However, Mr. Fonseca refused to speak to plaintiff. He completely refused to engage in any process, interactive or otherwise, in order to facilitate and comply with plaintiff's request, or to comply with his obligation as an agent of a covered employer to assure that there is reasonable accommodation for a qualified individual." *Id.* ¶ 4.22.

Plaintiff resigned from her job on April 5, 2010, immediately after an incident with

Ms. Negrón and Mr. Fonseca that occurred prior to Ms. Ortiz' lunch break. *See* Plaintiff's Resignation Letter April 5, 2010, Docket No. 35–23 (Spanish language), and a medical certificate attached thereto, and the certified English translation, Docket No. 43–7. The Court notes that the *Complaint* is silent as to: (a) the date of the alleged constructive discharge; (b) the fact that the April 6, 2010 claim filed with the Puerto Rico Department of Labor Anti–Discrimination Unit was filed after plaintiff was no longer working with Sears; (c) the record is also silent as to the filing of any other prior claims with her employer and/or the EEOC while plaintiff was still working with Sears, and (d) what events, if any, transpired between April 6, 2010 when the claim was originally filed until the March 7, 2011 date of the right to sue letter allegedly issued by the Equal Employment Opportunities Commission ("EEOC") and notified to plaintiff. Moreover, a copy of the March 7, 2011 right to sue letter is not part of the record. Indeed, the *Complaint* is based on unsupported, general conclusory allegations, with the exception of the two medical certificates of October 2005 and March 23, 2010, in addition to the copy of the EEOC claim filed on April 6, 2010.

Sears moved for summary judgment and the dismissal of the instant action, as plaintiff was unable to show a disability under the ADA and/or a *prima facie* case of employment discrimination on grounds of Sears' failure to provide reasonable accommodation, Sears' employment discrimination on grounds of her condition of diabetes, and constructive discharge. *See* Docket entries No. 35 and 36. Plaintiff opposed defendants' summary judgment request on the grounds that there are material issues of contested facts, which impair the granting of summary judgment. *See* Docket No. 51.

As stated above, this matter was referred to the Magistrate Judge for a report and recommendation. For the reasons set forth below, the Court hereby adopts and incorporates the findings of fact made by the Magistrate Judge, *see* Attachment No. 1.

### The Objections to the Report and Recommendation

The Magistrate Judge found the following triable issues of fact: (a) individual liability under both ADA and Puerto Rico Law 44; (b) retaliation; (c) failure to provide reasonable accommodation; (d) hostile work environment; and, (e) constructive discharge. The Magistrate Judge recommended that all the federal claims be dismissed with prejudice, and denied the constructive discharge. The Magistrate Judge further recommended that plaintiff's supplemental claims under Puerto Rico law be also dismissed.

Plaintiff Ortiz objected to all the findings of fact, legal analysis and recommendations made by the Magistrate Judge. *See* Docket No. 78. Defendants filed an opposition to plaintiff's objections, after having requested timely leave of Court. *See* Docket entries No. 81–83.

After a careful review of plaintiff's objections to the *Report and Recommendation,* Docket No. 77, the Court is forced to conclude that plaintiff is just seeking a second bite to the apple, as plaintiffs objections constitute a rehash of plaintiff's opposition to the defendants' motion for summary judgment. Plaintiff, however, alleges that the Magistrate Judge failed to address several "points" raised by Sears, and "confined his analysis to the purported insufficiencies in the failure-to-accommodate and the hostile environment/retaliation claims, and who based his recommendation on the *Faragher–Ellerth* [*Faragher v. City of Boca Raton,* 524 U.S. 775, 118

S.Ct. 2275, 141 L.Ed.2d 662 (1998)] defense." *See* Docket No. 78, pages 22–25.

The Court notes that plaintiff's counsel reiterates throughout the record her disagreement as to the Magistrate Judge's conclusion that there is no individual liability under Title VII and ADA based on First Circuit precedent *Fantini v. Salem State College*, 557 F.3d 22 (1st Cir.2009), and prior thereto other circuit courts. *See* Docket No. 51, page 7, and Docket No. 78, n. 2. The Court is barred from altering and/or not following the precedent in point of the First Circuit.[1]

At the outset, the Court finds that the record is devoid of certified medical information regarding plaintiff's high blood pressure condition, as well as her Type I diabetes, with the exception of: (a) plaintiff's Pre–Employment General Medical Physical Examination Certificate issued on October 31, 2005 by Yazmín V. Fuentes, MD, *see* Docket No. 35–6, and the certified English translation, Docket No. 43–3;[2] and, (b) Medical certificate issued by Joseph S. Campos Salgado, MD to Jacqueline Ortiz on March 23, 2010, which reads, in its pertinent legible part,[3] as follows: "Patient ____ diagnosis of DM type I which requires strict diet and blood sugar monitoring. Patient currently with uncontrolled blood sugar which requires special treatment and attention." *See* Docket No. 35–21. The Court notes that the Medical Certificate issued by Dr. Campos on

March 23, 2010 is silent as to what type of special treatment and attention is required for plaintiff, and what type of measures and/or reasonable accommodation are required from plaintiff's employer. Again, there is no mention as to plaintiff's high blood pressure condition and/or heart disease, if any.

### Disability v. Physical Impairment under the American with Disabilities Act

Plaintiff has requested a *de novo* review of the Magistrate Judge's *Report and Recommendation*, Docket No. 77. However, the Court prefers to start by reviewing the applicable provisions of ADA, which constitutes the legal grounds for granting summary judgment. In *Ramos–Echevarría, et al. v. Pichis, Inc. d/b/a Pichis Hotel and Convention Center, et al.*, 698 F.Supp.2d 262, 266–268 (D.P.R.2010), *affirmed*, *Ramos–Echevarría v. Pichis, Inc. d/b/a/ Pichis Hotel and Convention Center, et al.*, 659 F.3d 182 (1st Cir.2011), the Court held:

> Pursuant to the provisions of the ADA, disability of an individual is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A) (1990). "Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *See Regulations to Implement the Equal*

---

1. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1315 (2d Cir.1995); *Sheridan v. E.I. DuPont de Nemours and Company*, 100 F.3d 1061, 1077–1078 (3d Cir.1996); *Lissau v. Southern Food Serv.*, 159 F.3d 177, 181 (4th Cir.1998); *Smith v. Amedisys, Inc.*, 298 F.3d 434, 448–449 (5th Cir.2002); *Wathen v. General Electric Co.*, 115 F.3d 400, 405 (6th Cir.1997); *Williams v. Banning*, 72 F.3d 552, 555 (7th Cir.1995); *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1079 (8th Cir.2006); *Miller v. Maxwell's Inter. Inc.*, 991 F.2d 583, 587 (9th

Cir.1993); *Haynes v. Williams*, 88 F.3d 898, 899 (10th Cir.1996); *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir.1991); *Gary v. Long*, 59 F.3d 1391, 1399 (D.C.Cir.1995).

2. The only observation stated by Dr. Fuentes was "Pt. with dx DM Type I requires eating at her times." *See* Docket No. 43–3.

3. The Court notes that the Medical Certificate issued by Dr. Campos on March 23, 2010 has not been transcribed for the record.

*Employment Provisions of the Americans with Disabilities Act,* 29 C.F.R. § 1630.2(i) (1991). The ADA's definition of disability also accepts an individual "being regarded [by the employer] as having such an impairment." 42 U.S.C. § 12102(2)(c).

When considering a question of physical disability under the ADA, the Court will examine whether the plaintiff has established his or her discrimination claim under the ADA on physical disability grounds. The Court finds that *Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 511–514 (1st Cir.1996), illustrates the three separate and independent options available to plaintiff to show discrimination for physical disability under the ADA provisions:

The ADA is a federal civil rights statute, enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). . . .

. . .

To establish a claim of disability discrimination under the ADA, a plaintiff must prove three things by a preponderance of the evidence:

First, that he [or she] was disabled within the meaning of the Act. Second, that with or without reasonable accommodation he [or she] was able to perform the essential functions of [the] job. And, third, that the employer discharged him [or her] in whole or in part because of his [or her] disability.

*Katz v. City Metal Co., Inc.,* 87 F.3d 26, 30 (1st Cir.1996). [Second] A plaintiff may also indirectly prove his or her case "by using the prima facie case and burden shifting methods that originated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Id.* n. 2 (citations omitted); *see*

*Taylor v. Principal Financial Group, Inc.,* 93 F.3d 155, 162–63 (5th Cir.1996) (citations omitted). Under the *McDonnell Douglas* analysis, a plaintiff must first prove by a preponderance of the evidence that he or she (i) has a disability within the meaning of the Act; (ii) is qualified to perform the essential functions of the job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by a company subject to the Act; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result. *See Taylor,* 93 F.3d at 162–63.

The third option is provided by 42 U.S.C. § 12102(2)(C) (1990), under the definition of disability as to an individual, "being regarded as having such an impairment." In *Taylor,* 93 F.3d at 164, the Court held that:

**For purposes of proving ADA discrimination, it is important to distinguish between an employer's knowledge of an employee's disability versus an employer's knowledge of any limitations experienced by the employee as a result of that disability.** *This distinction is important because the ADA requires employers to reasonably accommodate limitations, not disabilities.*

. . .

**Accordingly, it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom.**

. . .

**If the employee fails to request an accommodation, the employer cannot be held liable for failing to provide one.** (Emphasis ours).
*See also Jacques v. Clean–Up Group, Inc.,* 96 F.3d at 513–514.

Although the ADA provisions do not provide a definition of the term impairment, one can be found in its regulations. 29 C.F.R. § 1630.2(h)(1) and (2) provides:

(h) Physical or mental impairment means:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. To determine whether plaintiff has an actual disability, plaintiff must: (a) "initially prove that he or she has a physical or mental impairment;" [42 U.S.C. § 12102(2)(A)]; (b) "demonstrate that the impairment limits a major life activity;" [42 U.S.C. § 12102(2)(A) (1994 ed.)]; and (c) "show that the limitation on the major life activity is 'substantia[l];'" [42 U.S.C. § 12102(2)(A)].

In *Arnold v. United Parcel Service, Inc.*, 136 F.3d 854, 860–861 (1st Cir.1998), the Court referred to the legislative history of the ADA for enlightenment when determining whether an individual has a disability under the ADA provisions.

**Indeed, Congress spoke directly to the medical condition at issue in this case [diabetis]: "persons with impairments, such as epilepsy or diabetes, which substantially limit a major life activity," are considered to have an actual disability, "even if the effects of the impairment are controlled by medication."** House Labor Report at 52 [H.R.Rep. No. 101–485, pt. II, at 52

(1990), reprinted in 1990 U.S.C.C.A.N. 303, 334 ("House Labor Report")]. Senate Report at 22 (same) [S.Rep. No. 101–116, at 23 (1989) ("Senate Report")].

. . .

Another important goal of the third prong of the [disability] definition is to ensure that persons with medical conditions that are under control, and that therefore do not currently limit major life activities, are not discriminated against on the basis of their medical conditions. For example, individuals with controlled diabetes or epilepsy are often denied jobs for which they are qualified. Such denials are the result of negative attitudes and misinformation.

. . .

The fundamental purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)(1994). In the context of employment discrimination, the thrust of this purpose is essentially to protect individuals who have an underlying medical condition or other limiting impairment, but who are in fact capable of doing the job, with or without the help of medications, prosthetic devices, or other ameliorative measures, and with or without a reasonable accommodation by the employer. *See e.g.*, 42 U.S.C. § 12101(a)(7). (Emphasis ours).

 Hence, in order to show disability, plaintiff must prove with preponderance of evidence that plaintiff is disabled within the meaning of ADA, that is: (a) that she is disabled within the meaning of the ADA; (b) that she is able to perform the essential functions of her job, with or without reasonable accommodation; and (c) that the adverse employment decision was based in whole or in part on her disability. *See*

*Pichis,* 698 F.Supp.2d at 269, citing *Phelps v. Optima Health, Inc.,* 251 F.3d 21, 24 (1st Cir.2001); *Garcia–Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 646 (1st Cir.2000). *See also Pichis,* 659 F.3d at 187–188.

In the instant case, the last part of the test is inapplicable, as Sears did not take any adverse employment decision against plaintiff. The record shows that plaintiff Ortiz decided to voluntarily resign on April 5, 2010, upon the incident that transpired during that morning and without giving her employer and herself the opportunity to analyze and discuss the events that transpired on that day. Further, plaintiff has the burden of proof to show constructive discharge. Plaintiff Ortiz also has the burden of showing with preponderance of evidence the first two parts of the test, as the record is devoid of evidence showing any adverse action taken by Sears. Plaintiff may prove her disability claim with direct evidence of discrimination or indirectly by using the burden shifting test set forth in *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817. *See Pichis,* 659 F.3d at 186–187. The Court further held:

> The *McDonnell Douglas* analysis requires the plaintiff to offer evidence sufficient to establish that he "(i) has a disability within the meaning of the [ADA]; (ii) is qualified to perform the essential functions of the job, with or without reasonable accommodations; (iii) was subject to an adverse employment action by a company subject to the [ADA]; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled employees; and (v) suffered damages as a result." *Id.* If he establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Freadman v. Metro. Prop. & Cas. Ins. Co.,* 484 F.3d 91, 99 (1st Cir.2007); *see also McDonnell*

*Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. If the employer offers a non-discriminatory reason, the burden then shifts back to the plaintiff to show that the employer's justification is mere pretext cloaking discriminatory animus. *Freadman,* 484 F.3d at 99.

. . .

Under the ADA, a disability is a physical or mental impairment that substantially limits one or more of an individual's major life activities. 42 U.S.C. § 12102(2)(A) (1990). Disability may also be established by having a record of such an impairment or being regarded as having such an impairment. 42 U.S.C. § 12102(2)(B), (c) (1990); *see also Santiago Clemente v. Exec. Airlines, Inc.,* 213 F.3d 25, 30 (1st Cir.2000). Ramos–Echevarría contends that he actually has an impairment and that he also has a record of such an impairment. He does not argue that Pichis regarded him as having such an impairment.

We apply a three-part analysis to determine whether an impairment qualifies as a disability under the ADA. *See Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998); *Carroll v. Xerox Corp.,* 294 F.3d 231, 238 (1st Cir.2002). First, the plaintiff must establish that he suffers from a physical or mental impairment. [FN8] *Carroll,* 294 F.3d at 238. Second, he must demonstrate that it affects life activities that are "major," i.e., "of central importance to daily life." *Id.* Major life activities are basic activities of daily life that an average person in the general population can perform with little or no difficulty— "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1991). Finally, he must show that the impairment "substantially

limits" the identified major life activity. *Carroll,* 294 F.3d at 238 (citing *Lebrón–Torres v. Whitehall Labs.,* 251 F.3d 236, 239–40 (1st Cir.2001)).

FN 8. The EEOC defines an impairment as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or any mental or physiological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h) (1991).

In assessing whether someone is disabled under the ADA, we must consider the impairment's effect on the particular individual. *Katz,* 87 F.3d at 32. The limitation caused by the impairment must be permanent or long-term. [*See*] 29 C.F.R. § 1630.2(j)(2)(ii), (iii) (1991). **Evidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability.** *See Toyota Motor Mfg., Ky., Inc.,* 534 U.S. 184, 198, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002).[4]

4. The Court is cognizant that ADA was amended in the year 2008, effective on January 1, 2009. The facts that triggered this action, are thus, covered by the ADA Amendments Act of 2008. The main purpose of the 2008 ADA amendments was to restore "the broad scope protection intended to be afforded by the ADA." Furthermore, Section 2. Findings and Purposes, (a) "(7) in particular, the Supreme Court, in the case of *Toyota Motor Manufacturing Kentucky, Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress ..." The definition of disability, 42 U.S.C. § 12102, was amended as follows:

(1) DISABILITY. The term 'disability' means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

(2) MAJOR LIFE ACTIVITIES.

"(A) IN GENERAL.—For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

"(B) MAJOR BODILY FUNCTIONS.—For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

"(3) REGARDED AS HAVING SUCH AN IMPAIRMENT.—For purposes of paragraph (1)(C):

"(A) An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

"(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

"(4) RULES OF CONSTRUCTION REGARDING THE DEFINITION OF DISABILITY.—The definition of 'disability' in paragraph (1) shall be construed in accordance with the following:

"(A) The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.

"(B) The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

"(C) An impairment that substantially limits one major life activity need not limit

**What is required is evidence showing that the impairment limits this particular plaintiff to a substantial extent.** *See Carroll,* 294 F.3d at 238 (citations omitted). (Emphasis ours).

659 F.3d at 186–187.

In the instant case, the Court finds that plaintiff has shown that she suffers a disability under ADA based on her diagnosis of diabetes Type 1 and her use of insulin,[5] however, plaintiff failed to show a *prima facie* case of impairment under ADA, as she failed to show that she suffers from an impairment that substantially limits one major life activity. The existence of a disability under ADA is determined on a case-by-case basis. *Carreras v. Sajo, García & Partners,* 596 F.3d 25, 33 (1st Cir.2010) ("To be substantially limiting, an impairment must cause a person to be 'unable to perform a major life activity as compared to an average person in the general population.' 29 C.F.R. § 1630.2(j)(1)"). "The analysis of when and under what conditions diabetes is considered a disability for ADA purposes 'is a matter of degree.' " *Carreras,* 596 F.3d at 34–35. "What is required is evidence showing that the impairment limits this

particular plaintiff to a substantial extent." *Carroll,* 294 F.3d at 238. Plaintiff's record is devoid of any supporting evidence, medically or otherwise, to establish that she cannot perform her tasks with or without reasonable accommodation. The supporting documents provided by plaintiff show that plaintiff merely informed Sears when she was hired that she suffered from diabetes Type I. As stated above, only two medical certificates were submitted, that is, the October 2005 and the March 23, 2010 certificates, which aside from stating that plaintiff suffers from diabetes Type I, both certificates are silent as to any special treatment and/or reasonable accommodation required for plaintiff's medical needs. The *Report and Recommendation,* Docket No. 28, further finds:

The uncontroverted evidence indicates that, over the course of the approximately five years that plaintiff worked for Sears, she was never denied a single request to use the restroom, measure her blood sugar level, take time to eat, or do anything else related to her condition [*see* Docket No. 43–1, page 43, lines 10–15], except that, on April 5, 2010, her

other major life activities in order to be considered a disability.
"(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.
"(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—
"(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;
"(II) use of assistive technology;
"(III) reasonable accommodations or auxiliary aids or services; or

"(IV) learned behavioral or adaptive neurological modifications.
"(ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.
"(iii) As used in this subparagraph—
"(I) the term 'ordinary eyeglasses or contact lenses' means lenses that are intended to fully correct visual acuity or eliminate refractive error; and
"(II) the term 'low-vision devices' means devices that magnify, enhance, or otherwise augment a visual image.".
*See* PL 110–325, September 25, 2008, 122 Stat 3553, 42 U.S.C. § 12101.

5. *See* Plaintiff's deposition, Docket No. 43–1, page 25.

lunch break was delayed no longer than twenty-five minutes. Plaintiff has failed to present evidence such that a jury could conclude that a twenty-five-minute delay in taking her lunch break constituted an unreasonable course of action for purposes of the accommodation recommended by her physicians. *See* ECF Nos. 43–3, at 1; 35–21. Plaintiff was still permitted to "eat [her lunch] at her times," ECF No. 43–3, at 1, considering that she was able to leave for lunch at 12:23 p.m. [on the day she resigned], within a half hour after she initially requested to leave—well within the one-hour period of time permitted by Sears for lunch breaks. Furthermore, plaintiff has provided no evidence that her condition was aggravated by the twenty-five-minute delay in taking her lunch break. Rather, it is uncontroverted that, after plaintiff drank juice, she measured her blood sugar level and it was normal. *See Edlund v. St. Anthony Med. Ctr.,* No. 00 C50216, 2002 WL 596358, at *5 n. 2 (N.D.Ill. Apr. 16, 2002) (granting defendant's motion for summary judgment even where plaintiff presented evidence that, on eight different occasions, her supervisor "refused to allow her to immediately check her blood sugar level, but instead made her wait anywhere from five minutes to an hour to do so," because, inter alia, no reasonable inference could be made that "the delays caused her to experience hypoglycemic reactions" and plaintiff "ha[d] not pointed out any evidence showing the delays in checking her blood sugar level on those eight occasions affected her physically or in any way interfered with her ability to do her job"). Under such circumstances, no reasonable jury can determine that Fonseca failed to reasonably accommodate her disability on April 5, 2010. **Although his approach to the situation on April 5, 2010, may reflect a lack of prudence and constitute unprofessional or even rude conduct, it does not rise to the level of a failure to provide reasonable accommodation pursuant to the ADA.** (Emphasis ours).

The Court finds that the Magistrate Judge's findings are fully supported by plaintiff's own statements, to wit:

QUESTION: So on that particular day that you are telling me [April 5, 2010], your last day that you worked, what was it that you felt that it was necessary for you to measure your sugar at that particular time that you were not able to do it? Did you feel bad or was it that you had been having high sugar since before?

ANSWER: I cannot answer you if I was having high sugar since before, because I do not recall that, I can look for it, but I already felt bad, I was getting headaches, I was already shaking. . . .

QUESTION: **At that time, did anyone tell you that you could not go to measure your sugar?**

ANSWER: **When . . .**

QUESTION: **But did anyone tell you that you could not measure your sugar?**

ANSWER: **No.**

. . .

QUESTION: **When was it that they told you that you could not eat?**

ANSWER: **The day I resigned.**

QUESTION: **What was it that they told you?**

ANSWER: **That I had to finish my job first and then I would go have lunch, the job of the tally of the cash registers.**

QUESTION: **And you eventually went to have lunch?**

ANSWER: **Yes.**

. . .

QUESTION: **That day, had you taken the 15 minute break?**

ANSWER: **That is what I explained to you a while ago, that I did not take it to try to finish the job that they were pressuring me to finish.**

*See* Plaintiff's deposition, Docket No. 43–1, pages 32–34. (Emphasis ours).

QUESTION: You had measured your sugar before telling Mr. Melvin Fonseca that you were going to lunch, you had measured it?

ANSWER: I was coming down from the upstairs floor from a cash tally towards my office to . . . I had not measured my sugar.

QUESTION: In other words, that you don't know at that time whether it was high or whether it was low?

ANSWER: No, because of the symptoms, it was low, because I was already shaking.

QUESTION: Did you get to check it eventually, after talking with Mr. Melvin Fonseca?

ANSWER: I never did get to talk to Mr. Melvin Fonseca, only those words.

QUESTION: Exactly. What did you do after the exchange?

ANSWER: After the exchange I left for lunch.

QUESTION: At what time was that?

ANSWER: I don't recall the time well, at noontime.

*See* Plaintiff's deposition, Docket No. 43–1, page 35.

QUESTION: In other words, you are coming down with him [associate José Carmona] to give him his change, you gave him the change, and you clock out and you went to lunch?

ANSWER: I gave him change, I looked for my medical certificates to take it to Melvin and to ask him what was the reason for why I couldn't go to lunch when he knew my medical condition. He does not want to talk to me at any time unless Melissa [Negrón] is there . . . he told me that he needed another person, a supervisor, a manager who was a woman. I bring in Mrs. Carmen Tañón, he tells me no, that it has to be with Melissa, so I turned around, I got my things and I clocked out, to go have lunch.

QUESTION: Did you measure your sugar at that time?

ANSWER: At that time, I did not measure my sugar. At that time I was talking to him and showing him the certificate.

QUESTION: Well, you told me that you clocked out, and you went to lunch, and at the moment that I'm asking you is . . . .

ANSWER: I clocked out and I went to lunch, and because of everything that had happened, and what had just had happened, I decided to resign. I left, I drank some juice, I made a resignation letter and I took it to him.

QUESTION: But my question is whether . . . before resigning, after clocking out, you . . . measured your sugar?

ANSWER: **I did not measure my sugar before resigning.**

QUESTION: **Did you drink some juice?**

ANSWER: **Half a juice, a juice that I bought at Walgreens.**

QUESTION: **When did you measure your sugar at that time, at noon?**

ANSWER: **After I made the letter of resignation, before giving it to him.**

QUESTION: **Okay. And how was your sugar?**

ANSWER: **I recall that it was approximately about 100, it had already gone up, I had a drink of juice, approximately 100, the sugar, 80 or 100, I don't recall what, exactly the number.**

QUESTION: And did you measure your sugar after having drank the juice?

ANSWER: Yes, I bought the juice at Walgreens when I clocked out to leave.

QUESTION: And where did you measure your sugar, at Walgreens?

ANSWER: No, in the car with my mom.

QUESTION: Do you drive?

ANSWER: No.

QUESTION: Did you call your mom to go get you?

ANSWER: Yes.

QUESTION: When did you call her?

ANSWER: As soon as I clocked out and I left the store, while I was walking toward Walgreens.

QUESTION: Okay. And how long, more or less, did your mom take to pick you up after that?

ANSWER: She didn't take long ... about less than half an hour, about 20 minutes.

QUESTION: Did you have lunch?

ANSWER: No, I drank the juice, I had lunch ... after I tendered the resignation letter to Melvin I went to lunch, because I had already drank some juice, that the sugar had gone up a little bit.

QUESTION: But you had not measured it.

ANSWER: Afterwards, when I was in the car, I measured it, that was already ... you're asking me whether I had lunch afterwards.

*See* Plaintiff's deposition, Docket No. 43–1, pages 37–40.

. . .

QUESTION: But did she tell you that she did not believe you? [Plaintiff's incident with Melissa Negrón two or three weeks prior to the April 5, 2013].

ANSWER: It's that it's necessary to say it, you know from their face.

QUESTION: In other words, that she made a face that you understand that it was that she did not believe that you felt bad?

ANSWER: Correct.

QUESTION: But she did not tell you that you could not leave?

ANSWER: No, she did not tell me.

QUESTION: Aside from that time, any other that you recall where there was any kind of ... ?

ANSWER: That I had to leave?

QUESTION: No, where there was any kind of attitude. You're the one who told me that there were some attitudes or faces.

ANSWER: Well, during several times "I have to go to the bathroom," "I have to check my sugar," "I have to do this," attitude "again?" or "go," or "well ..." And high sugar, you have to go to the bathroom a lot to be able to ... and drink a lot of water, because water makes the sugar go down and you urinate the sugar, and the sugar goes down too. If your sugar is too high you have to drink a lot of water too.

QUESTION: **And in all of those times, you, in fact, were able to go to the bathroom and, in fact, you were able to measure your sugar or do whatever you had to do?**

ANSWER: **Uh-huh, correct.**[6]

QUESTION: You have given me two specific events, the incident with Melvin, the last time you worked, and this incident that you had to leave early, that you had to show Melissa the glucometer. Any other, beyond what you told me, that she would make faces when you would tell her that you had to go to the bathroom, any other specific incident like that, that you recall with more detail?

ANSWER: As far as I recall ... no, those, the attitudes either at the sales floor or wherever, those that I told you.

*See* Plaintiff's deposition, Docket No. 43–1, page 343–44. (Emphasis ours).

QUESTION: Did you talk with Elizabeth Ayala about any particular schedule you need?

ANSWER: Schedule?

QUESTION: Uh-huh.

ANSWER: Not schedules. It depends again on the ...

QUESTION: Of what was happening that day, how ever you felt that day?

ANSWER: Correct.

*See* Plaintiff's deposition, Docket No. 43–1, pages 45–46.

QUESTION: She [Melissa Negrón] followed you to the bathroom. When did she follow you the bathroom?

ANSWER: When I was going to the bathroom two or three times.

...

QUESTION: But did she tell you anything, did she ask you whether you were going to the bathroom?

ANSWER: No.

*See* Plaintiff's deposition, Docket No. 43–1, page 53.

QUESTION: Did you tell Mrs. Melissa Negrón that you needed a particular schedule ...

ANSWER: For?

QUESTION: ... To attend your condition?

ANSWER: No, as I said a while ago, I do not need specific schedule. I do not have to, at 7:00 in the morning, 7:00, 7:00, 10:00, 10:00, it depends on the day, i depends on how my sugar is doing.

QUESTION: And did you tell her that those breaks of yours had to be of any particular length?

...

ANSWER: No, I mean the time it takes me to go to the bathroom, to check my sugar to see if it's high, if I have to eat, it depends on what I have to do. If I have I have to check my pressure, if I have to urinate.

QUESTION: It depends on how you felt that day?

ANSWER: Aha, it depends on the need I had at that time.

*See* Plaintiff's deposition, Docket No. 43–1, pages 54–55.

QUESTION: The truth is that you stopped working on April 5, which is two weeks later [after plaintiff filled out a document requesting the company to adjudicate to sick leave the hours corresponding to March 23, 2010, when plaintiff left early to go to the doctor].

---

**6.** The above admission constitutes the best evidence that plaintiff was able to take her regular short breaks in between formal regular meal periods to take meals and/or to check her sugar levels. Hence, there is no prior significant pervasive past history between the company and plaintiff.

ANSWER: Well, two weeks after that, I had to fill it in two times for them to pay it them to me.

QUESTION: Did she tell you at any time that they were not going to be paid to you?

ANSWER: No, but I did not see that they had paid me, so I filled it in again.

*See* Plaintiff's deposition, Docket No. 43–1, page 57.

In sum, the Court summarizes plaintiff's relevant statements as follows:

1. Except for the two medical certificates mentioned above, that is, the October 2005 and March 3, 2010 certificates, plaintiff's record is devoid of any other medical information.

2. Plaintiff never requested reasonable accommodation from Sears, as her statements show that plaintiff only limited herself to inform her employer that she suffers from diabetes Type 1, and that she needs to take her meals timely. Moreover, when Sears offered plaintiff a reasonable accommodation, plaintiff refused, as she did not need any schedules.

3. On April 5, 2010, plaintiff admitted that she was working, and that she was working under pressure, however, she still decided to skip on her own volition her mid-morning break to measure her sugar. Moreover, even after the incident, she failed to measure her sugar and/or to provide herself a meal intake or snack, if necessary.

4. Plaintiff did not request reasonable accommodation to Elizabeth Ayala or Melissa Negrón during her working term with her employer Sears.

5. Sears never refused to pay plaintiff the sick leave requested.

Hence, after taking into consideration, the record and the Magistrate Judge's *Report and Recommendation,* Docket No. 77, the Court finds that no reasonable jury can determine that Sears failed to provide reasonable accommodation for plaintiff's disability. Plaintiff has simply failed to show a *prima facie* case of employment discrimination under ADA and Title VII.

The Court will not repeat the analysis already made by the Magistrate Judge as to the triable issues, as the Court fully agrees with all the legal determinations and recommendations included in the *Report and Recommendation,* Docket No. 77, which are adopted and incorporated herein, after a *de novo* review of the facts, the record and the legal memorandums of the parties. The Court simply disagrees with plaintiff's objections to the *Report and Recommendation,* and lack of legal foundation.

## Constructive Discharge

▇▇▇ Plaintiff claims constructive discharge due to the isolated incident of April 5, 2010. "Constructive discharge typically 'refers to harassment so severe and oppressive that staying on the job while seeking redress—the rule save in exceptional circumstances—is intolerable.'" *Gerald v. University of Puerto Rico,* 707 F.3d 7, 25 (1st Cir.2013), citing *Lee–Crespo v. Schering–Plough Del Caribe, Inc.,* 354 F.3d 34, 45 (1st Cir.2003) (internal quotations and citation omitted). "A successful constructive discharge claim requires 'working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *Id.,* citing *Pennsylvania State Police v. Suders,* 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

In the instant case, the record clearly shows otherwise. Plaintiff stated in her deposition that she presented her resignation even though she was not asked by the

administration, at any time, to resign. *See* Plaintiff's deposition, Docket No. 43–1, pages 37–40. The fact is that plaintiff resigned on April 5, 2010, as an impulsive act, and without a single explanation to her employer Sears. Furthermore, it uncontested that plaintiff filed a charge of discrimination with the Anti–Discrimination Unit of the Puerto Rico Department of Labor on April 6, 2010, wherein plaintiff clearly states, "[d]uring the whole time, that I have been working for this company, I have never had any complaint or problem, including by all my bosses." *See* Docket No. 43–12. "My work had been categorized as excellent." *Id.* "Some time ago, due to my problems with my sugar, because I have diabetes, I started to have problems with the operations manager because he gets upset when I have to go eat, this problem becomes more intense 3 months ago, when my supervisor also started to have a negative attitude and I started having problems at the time of verifying my sugar, going to the bathroom, going out to eat, etc." *Id.* The Court finds that these are conclusive statements. Moreover, plaintiff admitted that she did not return to work except to deliver her resignation letter to Mr. Fonseca. *See* Plaintiff's deposition, Docket No. 43–1, pages 37–40. Hence, plaintiff could not have suffered "severe and oppressive" working conditions when she voluntarily returned to her work place to personally deliver her resignation letter to the operations manager. *Gerald v. University of Puerto Rico,* 707 F.3d at 25.

Considering that plaintiff was never terminated by her employer, as she resigned voluntarily after an isolated incident that took place on April 5, 2010, the Court refuses to act as a super overseeing personnel office. The Court remains mindful that its role is not to "second-guess[ing] the business decisions of an employer [and/or an employee], nor to impose [its] subjective judgments of which person would best fulfill the responsibilities of a certain job." *Petitti v. New England Tel. & Tel. Co.,* 909 F.2d 28, 31 (1st Cir.1990). "Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employer's nondiscriminatory business decisions." *Mesnick v. General Electric Co.,* 950 F.2d 816, 823 (1st Cir.1991).

Hence, the Court finds that plaintiff was not constructively discharged, rather that she resigned knowingly and voluntarily without any "sever and oppressive" conditions present. *Gerald v. University of Puerto Rico,* 707 F.3d at 25. *See* Plaintiff's deposition, Docket No. 43–1, pages 37–40. The Court finds that one isolated incident and/or bare allegations and/or conclusive statements, are insufficient as they fail to prove any type of discrimination conduct from the defendants. The Court further finds that plaintiff failed to show a *prima facie* case under ADA and Title VII.

Plaintiff's claim for constructive discharge is denied, as she failed to show that her working conditions were "so intolerable that a reasonable person would have felt compelled to resign." *Gerald v. University of Puerto Rico,* 707 F.3d at 25. Hence, summary judgment is warranted as to the claim of constructive discharge.

**Conclusion**

For the reasons stated above, the Court finds that there is no plain error in the Magistrate Judge's *Report and Recommendation,* Docket No. 77. Hence, the *Report and Recommendation* is hereby adopted *in toto,* as supplemented herein.[7]

---

7. "The Court need not go further for it refuses to write at length to no other end than to hear its own words resonate as to the instances alleged as errors by plaintiff." Where as

All federal causes of action are dismissed with prejudice and all causes of action under state law are dismissed without prejudice.

The *Report and Recommendation* issued by the Hon. Magistrate Judge Marcos E. López shall be published as an *addendum* of the instant *Opinion and Order.*

Judgment is to be entered accordingly.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

MARCOS E. LÓPEZ, United States Magistrate Judge.

On May 19, 2011, plaintiff Jacqueline Ortiz González ("plaintiff" or "Ortiz") filed a complaint against defendants Sears Holding Corporation, also known as Sears Roebuck of Puerto Rico, Inc. ("Sears"), Melvin Fonseca ("Fonseca"), and Melissa Negrón ("Negrón"), alleging claims under the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* Law 44 of July 2, 1985 ("Law 44"), P.R. Laws Ann. tit. 1, § 501 *et seq.,* and Law 80 of May 30, 1976 ("Law 80"), P.R. Laws Ann. tit. 29, § 185a *et seq.* ECF No. 1. Pending before the court is defendants' motion for sum-

mary judgment, along with plaintiffs response and defendants' reply. ECF Nos. 35; 51; 63.[1]

## I. SUMMARY OF UNCONTESTED MATERIAL FACTS [2]

### A. Plaintiff's Medical Condition

Plaintiff was diagnosed with diabetes mellitus type 1 when she was fifteen years old. Due to her condition, plaintiff does not secrete insulin at all. As such, she has always been on insulin treatment to control her blood sugar levels. She uses two types of insulin: long-term and rapid-action. Plaintiff takes long-term insulin twice a day, in the morning and at night, and rapid-action insulin with her food or whenever her sugar levels get too high. *See* ECF Nos. 35–1, ¶¶ 2, 8; 51–1, ¶¶ 1.2–1.3, 2, 8; 63–1, ¶¶ 1.2–1.3.

Ordinarily, plaintiff injects herself in the morning with both the long-term and rapid-action insulin and has her breakfast. Between 2.5 and 3 hours later, she has a light snack and, another 2.5 to 3 hours later, she has her lunch. Another 2.5 to 3 hours later, she has an afternoon snack, and 2.5 to 3 hours later she has dinner. She has a final snack before going to bed.

---

here, a [Magistrate Judge] "has produced a first-rate work product, a reviewing tribunal should hesitate to wax longiloquence simply to hear its own words resonate." *See Lawton v. State Mut. Life Assu. Co. of Am.,* 101 F.3d 218, 220 (1st Cir.1996); *Ayala v. Unión de Tronquistas de Puerto Rico, Local 901,* 74 F.3d 344, 345 (1st Cir.1996); *In re San Juan Dupont Plaza Hotel Fire Litig.,* 989 F.2d 36, 38 (1st Cir.1993).

1. Plaintiff has also filed an informative motion pertaining to the pending motion for summary judgment, to which defendants have filed a response. ECF Nos. 66; 70.

2. Local Rule 56 "structures the presentation of proof at summary judgment." *Goya Foods, Inc. v. Orion Distributors, Inc.,* 916 F.Supp.2d

177, 179 (D.P.R.2012). It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," *CMI Capital Market Inv. v. González–Toro,* 520 F.3d 58, 63 (1st Cir.2008), by requiring "a party opposing a motion for summary judgment to accept, deny, or qualify each entry in the movant's statement of material facts paragraph by paragraph and to support any denials, qualifications, or new assertions by particularized citations to the record." *Cabán Hernández v. Philip Morris USA, Inc.,* 486 F.3d 1, 6–7 (1st Cir.2007). In accordance with Local Rule 56(e), all proposed facts that are properly supported by record evidence and have not been successfully controverted or qualified by the opposing party have been deemed admitted.

Over the course of one day, plaintiff has three meals and three snacks. *See* ECF Nos. 35–1, ¶ 9; 51–1, ¶ 9.

Plaintiff must check her blood sugar level with every meal, using a medical device called a glucometer. Additionally, she usually checks her blood sugar level when she takes her snack. Whether she does so depends on how her blood sugar levels had been that day. She also needs to check her blood sugar levels if she feels ill. The times when plaintiff needs to monitor her blood sugar vary constantly and depend on a number of factors, including the time she had breakfast and whether she feels ill. Moreover, diabetes patients urinate more frequently than non-diabetic individuals in order to eliminate excess sugar. *See* ECF Nos. 35–1, ¶¶ 10–11; 51–1, ¶¶ 1.10–1.11, 1.13–1.14, 7.13–7.15, 10–11; 63–1, ¶¶ 1.10–1.11, 1.13–1.14, 7.13–7.15.

Ortiz must have a snack when her blood sugar is low or adjust her insulin treatment when her blood sugar is high. A "snack" could involve drinking four ounces of juice. Failure to take a snack when needed runs the risk of hypoglycemia, which could result in symptoms such as slurred speech, confused thinking, disorientation, profuse sweating, and even loss of consciousness. Plaintiff specifically has experienced symptoms such as hunger, thirst, trembling, nervousness, sweating, headache, coldness, heat, or pain. Stress is a factor which may affect the blood sugar levels of a diabetes patient. Diabetes was the seventh leading cause of death listed on U.S. certificates in 2007. *See* ECF Nos. 51–1, ¶¶ 1.7, 1.9, 1.12, 1.14–1.15, 7.13–7.14, 7.16–7.17; 63–1, ¶¶ 1.7, 1.9, 1.12, 1.14–1.15, 7.13–7.14, 7.16–7.17.

**B. Plaintiff's Background**

Plaintiff graduated from high school in 2004, attended the University of Puerto Rico, Bayamon campus, from May 2004 to May 2009, and transferred to Atlantic University College on February 25, 2010. As of March 29, 2012, she had not yet graduated from Atlantic University College. *See* ECF Nos. 35–1, ¶ 3; 51–1, ¶ 3.

In 2005, plaintiff began working for Sears as a part-time Sales Associate in the Service and Parts Department of the Bayamon Service Center under the supervision of Janice Cotto ("Cotto"). At the time, she underwent a pre-employment examination where the evaluating physician stated that plaintiff' suffered from type I diabetes and "requires eating at her times." ECF No. 43–3, at 1. Plaintiff provided the medical certificate from the examination to Sears, which was placed in her personnel file. *See* ECF Nos. 35–1, ¶¶ 4–5; 51–1, ¶¶ 2.1–2.2, 2.5–2.7, 4–5; 63–1, ¶¶ 2.1–2.2, 2.5–2.7.

During her pre-employment interview, plaintiff disclosed her diabetes condition to Elizabeth Ayala ("Ayala"). At the time, Ayala was the Human Resources Representative at the Service and Parts Department. Plaintiff also explained that she needed to take breaks to monitor her blood sugar levels or ingest food, or leave if she felt ill. Plaintiff told Ayala that she "ha[d] to eat at specific hours." ECF No. 51–3, at 9. Plaintiff, however, did not request a specific schedule for her breaks. She told Ayala that it depended on her blood sugar levels each day. Ayala informed Ortiz that Sears "provide[d] a break during the scheduled hours." *Id.* at 10. Ayala also told her that, if she "needed more than that break, ... she could always talk to her manager and she would refer it to Human Resources Manager and they could evaluation [*sic*] the situation individually." *Id.* While plaintiff worked at the Service and Parts Department of the Bayamon Service Center, Cotto would always let her use the restroom, measure her blood sugar levels, take snacks, and

administer insulin. *See* ECF Nos. 35–1, ¶ 12; 51–1, ¶¶ 2.3–2.4, 2.9–2.11, 3.1, 12; 63–1, ¶¶ 2.3–2.4, 2.9–2.11, 3.1.

Sears employees are entitled to one fifteen-minute rest period for each four hours of work in a workday. Additionally, Sears employees have a right to a sixty-minute lunch break if they work five hours or more in a workday. *See* ECF Nos. 35–1, ¶¶ 15; 51–1, ¶¶ 3.6, 15; 63–1, ¶ 3.6.

## C. Galería Los Paseos Store

On September 7, 2008, after the department where she worked closed, plaintiff was transferred to the Galería Los Paseos Store ("Paseos Store") as a part-time Office Associate assigned to the Human Resources ("HR") Department. By this point, Ayala had been transferred to the position of HR Lead at the Paseos Store. As such, Ayala was plaintiff's first supervisor at the Paseos Store. When plaintiff started there, she again informed Ayala about her medical condition and her need to monitor her blood sugar level, to eat snacks if it was too low, and to inject insulin. Ortiz also explained to Ayala what to do if she fainted. Nevertheless, plaintiff never requested a specific schedule of breaks to ingest food or monitor her blood sugar to Ayala, Negrón (HR Lead at time of plaintiff's resignation), or anyone else at Sears. *See* ECF Nos. 35–1, ¶¶ 6–7, 13; 51–1, ¶¶ 2.15–2.16, 3.2, 6–7, 13; 63–1, ¶¶ 2.15–2.16, 3.2.

While Ayala was plaintiff's supervisor at the Paseos Store, plaintiff's diabetes condition was in an uncontrolled state. Under such circumstances, blood sugar levels can be high all of the time or drop to very low levels. Ayala told the store manager about plaintiff's medical condition. When there was a change of managers, she would give the new manager the information. *See* ECF Nos. 51–1, ¶¶ 3.3–3.4; 63–1, ¶¶ 3.3–3.4.

Each time that plaintiff asked Ayala for "a break before the two hours and [Ayala] understood that it wasn't going to interfere with her job and she could take it, [Ayala] would say yes." ECF No. 51–3, at 30. Ayala would let Ortiz go to the restroom as needed. She did not consider plaintiff's restroom breaks to be excessive. *See* ECF Nos. 51–1, ¶¶ 2.12, 3.8; 63–1, ¶¶ 2.12, 3.8.

Ayala had "always known [plaintiff] to be a good associate." ECF No. 51–3, at 11. She never had any complaints about Ortiz's work. Cotto, plaintiff's first supervisor, gave her good references about her work. Cotto considered plaintiff to be a good employee who could run the office in her absence and do the work of HR Lead. While under Ayala's supervision, Ortiz typically completed all of the tasks she was assigned. On the occasions when the time allotted was insufficient to do so, she would inform Ayala. *See* ECF Nos. 51–1, ¶¶ 2.14, 2.26–2.27; 63–1, ¶¶ 2.14, 2.26–2.27.

Plaintiff would monitor her blood sugar levels with a glucometer in a restroom of the Paseos Store, which was across the hall from the HR office. The process of measuring her sugar levels would take ten to fifteen seconds. In the event that her blood sugar level was very high, she had to administer insulin. At the Paseos Store, she would do this in a restroom stall. The entire process would take ten to fifteen minutes. *See* ECF Nos. 35–1, ¶ 17; 51–1, ¶¶ 5.2–5.3, 17; 63–1, ¶¶ 5.2–5.3.

Plaintiff would bring snacks from home or buy something to eat during her work shift to stabilize her blood sugar levels. If plaintiff's blood sugar levels reached over 400, she would have to leave the workplace. Plaintiff's physician's instructions to her indicated that, under such circumstances, she would have to administer insulin and go home to rest. If her blood

sugar levels nonetheless remained high, she would have to seek immediate medical attention, either with her doctor or at an emergency room. During the period Ortiz was under the supervision of Negrón, who was HR Lead at the time of plaintiff's resignation, this occurred only one time. *See* ECF Nos. 51–1, ¶¶ 5.4–5.6; 63–1, ¶¶ 5.4–5.6.

At the Paseos Store, plaintiff was generally assigned the morning shift, from 9:00 a.m. to 1:00 p.m. Plaintiff would have breakfast before going to work. As a part-time employee, plaintiff would generally work shifts that were not longer than five hours. Under Ayala's supervision, plaintiff worked approximately fifteen to twenty hours per week. *See* ECF Nos. 35–1, ¶¶ 18–20; 23; 51–1, ¶¶ 2.20, 18–20, 23; 63–1, ¶ 2.20.

At Sears, the Department Manager would distribute the hours assigned to the Department among the employees. The decision as to the number of hours assigned to the HR Department at the Paseos Store was made by Sears employees in the United States. The Operations Manager would notify the HR Lead the amount of hours allotted to the HR Department. Forty hours would be designated for the HR Lead, who was a full-time employee. The HR Lead would then distribute the remaining hours among the part-time employees. *See* ECF Nos. 35–1, ¶ 23; 51–1, ¶¶ 2.18, 24; 63–1, ¶ 2.18.

When plaintiff first began working at the Paseos Store, there were only two employees assigned to the HR Department: Ayala and plaintiff. In the summer of 2009, a second part-time employee, Ricardo Quiñones ("Quiñones"), was hired. Quiñones remained as an Office Associate at the time of Ortiz's departure in April of 2010. Even when Quiñones was hired, Ayala would typically assign more hours to plaintiff because she was "more knowl-edgeable of the work." ECF No. 51–3, at 21. Quiñones mostly handled cash deposits. His availability was also limited because he was a student. *See* ECF Nos. 35–1, ¶ 24; 51–1, ¶¶ 2.17, 2.19, 25; 63–1, ¶¶ 2.17, 2.19.

Plaintiff's tasks as an Office Associate involved performing office work, assisting employees, and working with the store's payroll. *See* ECF No. 51–4, at 25. The functions related to the safe funds occurred on a daily basis, took approximately two hours, and were usually conducted in the morning. The task of "register detail," which also was conducted daily, took about ten or fifteen minutes. ECF No. 51–1, ¶ 2.23. An Office Associate might also be assigned the monthly task of reconciling the cash registers, discussed further below. *See* ECF Nos. 35–1, ¶¶ 25, 52; 51–1, ¶¶ 2.22–2.23, 26, 54; 63–1, ¶¶ 2.22–2.23.

### D. Change in Management

At the end of May of 2009, Fonseca began working as the Operations Manager at the Paseos Store. *See* ECF Nos. 35–9, at 5; 58–1, at 104. He oversaw the operational part of the entire store, including the HR Department. Additionally, after the Store Manager left at the beginning of 2010, Fonseca assumed the responsibilities of said position. On one occasion, Ayala mentioned to Fonseca that Ortiz had a medical condition and needed to monitor her blood sugar levels, administer insulin, and take breaks. ECF No. 51–3, at 31–32. Fonseca was aware "that [Ortiz] has a problem with her sugar." ECF No. 58–1, at 114; *see* ECF Nos. 51–1, ¶¶ 3.5, 3.7, 4.1, 4.9; 63–1, ¶¶ 3.5, 3.7, 4.1, 4.9.

In October of 2009, Ayala left the position of HR Lead at the Paseos Store. Although plaintiff applied for the position of HR Lead, she was not chosen. Nevertheless, she performed the duties of HR Lead for approximately two months until

Negrón assumed said position. On December 13, 2009, Negrón began working as HR Lead at the Paseos Store, with Fonseca as her direct supervisor. Negrón graduated from the University of Puerto Rico in 2006 and received a Master's Degree in Human Resources from Metropolitan University in 2008. She worked as a "job coach" or "employment trainer" at Educavipro, Inc., from 2005 thru 2008. ECF No. 43-4, at 7. At said organization, Negrón was responsible for identifying job opportunities for persons with disabilities and performing on-the-job training. She had also previously worked part-time at Kmart. See ECF Nos. 35-1, ¶¶ 29-32; 51-1, ¶¶ 2.26, 4.2-4.4, 4.6, 4.9, 31-34; 63-1, ¶¶ 2.26, 4.2-4.4, 4.6, 4.9.

When Negrón assumed the position of HR Lead at the Paseos Store, Ortiz informed her that she had diabetes and high blood pressure. She also explained that she would need to take breaks to eat, check her blood sugar, and go to the restroom frequently. Plaintiff, however, did not request breaks of a specific length of time. See ECF Nos. 35-1, ¶ 22; 51-1, ¶¶ 5.1, 22; 63-1, ¶ 5.1.

Plaintiff, along with Fonseca, trained Negrón for about one week. On December 21, 2009, Negrón was diagnosed with influenza and was out sick until December 31, 2009. As HR Lead, Negrón supervised the HR Department, including both Office Associates, Ortiz and Quiñones. She also assigned their work schedules. Negrón, plaintiff, and Quiñones were the only three employees in the HR Department. See ECF Nos. 35-1, ¶¶ 33-34; 51-1, ¶¶ 4.5-4.8, 35-36; 63-1, ¶¶ 4.5-4.8.

In distributing the hours assigned to the HR Department, Negrón considered plaintiff's and Quiñones's availabilities and which employee, if either, was assigned to work on Sunday. Over the course of the fourteen weeks between January 10, 2010, and April 3, 2010, Ortiz was assigned fewer hours than Quiñones during five of the weeks. See ECF Nos. 35-1, ¶¶ 35-36; 51-1, ¶¶ 37-38.[3]

Over the course of the five weeks between January 3 and February 6, 2010, plaintiff and Quiñones were scheduled for 83 hours and 61 hours, respectively. Plaintiff was assigned more hours than Quiñones during each of the five weeks. During said period, plaintiff was assigned between 15 and 23 hours per week, while Quiñones was not assigned more than 12.5 hours per week. See ECF Nos. 51-1, ¶ 6.6; 63-1, ¶ 6.6.

Between February 14 and April 3, 2010, plaintiff and Quiñones were assigned 95 and 103.5 hours, respectively. During said period, plaintiff was assigned between 12 and 15.5 hours per week, while Quiñones was assigned between 12 and 19.5 hours per week. During the five weeks between February 28 and April 3, 2010, Quiñones was assigned more hours than plaintiff. On February 25, 2010, plaintiff began taking three night classes at Atlantic University College. The classes did not limit her availability for work. See ECF Nos. 35-1, ¶ 37; 51-1, ¶¶ 2.21, 6.7, 39; 63-1, ¶¶ 2.21, 6.7.

"[T]here were times" when plaintiff "could not measure [her] sugar," because her supervisors "wanted [her] to finish [a job] quickly." ECF No. 58-1, at 27. Over the course of Negrón's supervision of Or-

---

**3.** Specifically, during the week of February 28 to March 6, Ortiz was assigned two fewer hours, but worked on Sunday. Between March 7 and 13, she was assigned two fewer hours. Between March 14 and 20, she was assigned three fewer hours. Between March 21 and 27, she was assigned one fewer hour. Between March 28 and April 3, she was assigned four fewer hours, but worked on Sunday. See ECF Nos. 35-1, ¶ 36; 51-1, ¶ 38.

tiz—from mid-December 2009 to early April 2010—their shifts overlapped on approximately thirty-two days. When plaintiff would tell Negrón that she had to check her sugar, Negrón would respond, "[O]h, well, go," or ask, "[A]gain?" and make "a gesture." *Id.* at 36. On two or three occasions, when plaintiff went into the restroom, Negrón also entered "quickly, ... stay[ed] standing for a little while and le[ft] ... quickly again." *Id.* at 50. Negrón was not "standing in front of the mirror." *Id.; see* ECF Nos. 35–1, ¶ 38; 51–1, ¶¶ 5.8–5.10, 5.12, 40; 63–1, ¶¶ 5.8–5.10, 5.12.

On at least one occasion, when Fonseca saw plaintiff eating at the workplace, he asked, "[Y]ou are eating again?" ECF No. 51–2, f 12. At least once, when plaintiff "went to drink water," he would ask "why [she] was drinking so much." *Id.* Fonseca also "scream[ed] to [plaintiff] in front of sales associates and clients, making comments about [her] taking too much time to complete a task." *Id.; see* ECF Nos. 51–1, ¶ 5.14; 63–1, ¶ 5.14.

On an unspecified number of occasions, Fonseca and Negrón, with a "bad attitude ... or making faces," stated to plaintiff, "Oh, you're going to the bathroom again," or asked why she had "not finished [her work] in so long," in front of customers and other employees. ECF No. 58–1, at 62.[4] Fonseca and Negrón had "a bad demeanor" or "a negative attitude the whole time." *Id.* at 61–62; *see* ECF Nos. 51–1, ¶¶ 5.11, 5.14–5.16; 63–1, ¶¶ 5.11, 5.14–5.16.

Every time that plaintiff had to go to the restroom, measure her blood sugar, or do anything else related to her condition, she was in fact able to do so. Aside from a contested incident on April 5, 2010, dis-

cussed below, plaintiff was never specifically prohibited from taking time to ingest food. *See* ECF Nos. 35–1, ¶¶ 58, 60; 51–1, ¶¶ 60, 62.

### E. Plaintiff's Performance

#### 1. Sign Transmission

"Inasmuch as the Marketing Department" was allocated thirty to thirty-two hours per week, whereas the HR Department was given approximately sixty-eight hours and up to eighty during "the high season," "the marketing duty of 'sign transmission' was assigned to the HR Department" sometime in the beginning of 2010. ECF No. 35–1, ¶ 39. Plaintiff had previously participated in a course titled "How to Print Signs" between September 25 and November 14, 2008. ECF No. 35–17; *see* ECF Nos. 35–1, ¶¶ 39, 41, 23; 51–1, ¶¶ 6.1, 41, 43; 63–1, ¶ 6.1.

This task, which was to be done on Tuesdays and Thursdays by the Office Associate scheduled to work on that date, entailed printing the store promotions. Specifically, the task required that the Office Associate sit in front of a computer that had already received the signs and, depending on the sign size, place the appropriate size paper in the printer and print the same. After printing the signs, the associate would separate them by department. An employee for the Marketing Department was responsible for placing the signs in the store. The task would take the Office Associate approximately thirty minutes. *See* ECF Nos. 35–1, ¶ 40; 51–1, ¶¶ 6.1, 42; 63–1, ¶ 6.1.

Negrón would regularly send electronic communications to Ortiz and Quiñones detailing the lists of specific tasks to do on a

---

4. On the pages cited by plaintiff in support of proposed fact 5.15, there is no testimony concerning whose attitude, "faces," or remarks are being mentioned. *See* ECF No. 58–1, at 62–63. Nevertheless, in light of plaintiff's other deposition testimony, it is a reasonable inference that she was referring to Fonseca and Negrón.

particular day. Most of the e-mails were sent because she was not going to be present at the store at the same time as the Office Associates. *See* ECF Nos. 35–1, ¶ 42; 51–1, ¶ 44.

The first time that the task of sign transmission was assigned in writing to plaintiff was on February 9, 2010.[5] On that day, Negrón sent Ortiz and Quiñones an e-mail stating in part:

> Last week I assigned several tasks for the days that I was not going to be in the store and many of them were not done. I understand that sometimes there isn't time for everything but it is important that we keep communication open about what was done and not, to then establish priorities.

ECF No. 43–14, at 11. The e-mail includes a list comprised of more than fifteen different tasks, including six which had to be conducted on a daily basis and six which had to be conducted at least once a week. The e-mail also indicates that sign transmission was to occur on Tuesdays and Thursdays. On Tuesdays, an Office Associate was also expected to take the attendance of all managerial employees and associates. *See* ECF Nos. 35–1, ¶ 43; 51–1, ¶¶ 6.2–6.4, 45; 63–1, ¶¶ 6.2–6.4.

During the first three weeks following the February 9, 2010, e-mail, Ortiz worked each Tuesday and Thursday, whereas Qui-ñones worked only one (February 25, 2010). *See* ECF No. 51–4, at 43–72. Quiñones worked none of the Tuesdays and three of the Thursdays between February 9 and March 19, 2010, the date of plaintiff's Performance Plan for Improvement, discussed below. *See id.* at 54–66. Between February 9 and April 5, 2010, plaintiff's final day, she worked each Tuesday and Thursday—a total of seventeen days—whereas Quiñones worked only five. *See* ECF Nos. 51–1, ¶¶ 6.5, 6.15; 63–1, ¶¶ 6.5, 6.15.

On February 22, 2010, Negrón sent plaintiff an e-mail assigning her several tasks for February 23, 2010, including completing office detail and reports and sign transmission. Two days later, Negrón sent plaintiff an e-mail indicating that "the transmission of the signs had not been done, the detail had not been worked on and the office reports had not been worked on completely." ECF No. 43–14, at 7; *see* ECF Nos. 35–1, ¶¶ 44–45; 51–1, ¶¶ 46–47.

## 2. Performance Plan for Improvement

On March 19, 2010, Negrón prepared a Performance Plan for Improvement ("PPI") concerning plaintiff's work performance. The PPI reads in part:

> On Feb/9/10, I sent an e-mail specifying the daily tasks with their priorities and up to today, March/14/2010,[6] you are

---

5. The record contains an email from Negrón to Ortiz on Tuesday, February 2, 2010, stating in part, "I need you to work on the following on Thursday ... 4. Print Transmitted signs." ECF No. 43–14, at 12. Said email has not been specifically cited by the parties. Moreover, elsewhere, defendants contend that "[t]here is no evidence that said task was assigned on February 9 for the first time." ECF Nos. 51–1, ¶ 6.10; 63–1, ¶ 6.10. Nevertheless, this is not inconsistent with defendants' admission of plaintiff's proposed fact indicating that "[t]he first time that this task was assigned *in writing* to plaintiff was on February 9, 2010." ECF Nos. 51–1, ¶ 6.2

(emphasis added); 63–1, ¶ 6.2. As such, the fact is uncontested.

6. The PPI document elsewhere indicates that the "Current Date" was March 19, 2010. ECF No. 43–5, at 1. Moreover, although the certified translation states "March/14/2010," the original Spanish-language document states "19/Marzo/10." *Compare* ECF No. 43–5, at 1, *with* ECF No. 35–18, at 1. In addition, plaintiff testified that the PPI was discussed with her on March 20, 2010. *See* ECF No. 43–1, at 67.

not fully meeting these responsibilities. When you fail to meet these responsibilities, the productivity of the office and the store is affected, even more when you are failing to do the transmission of the signs, which impacts the marketing of the store and customer service.

... The store gets affected when you fail to meet your tasks because failing to transmit the signs, they are not placed on time and the customer service is affected. In addition, that it affects your co-workers who have to complete your tasks in addition to their own.

ECF No. 43–5, at 1. The PPI also states, "If you continue failing to complete the assigned tasks and do not show progress, other disciplinary measures will be taken, including suspension and termination of employment." Id. The PPI was discussed with Ortiz on March 20, 2010. See ECF Nos. 35–1, ¶ 46; 51–1, ¶¶ 6.8–6.10, 48; 63–1, ¶¶ 6.8–6.10.

On the PPI, plaintiff wrote, "I signed, but I don't agree, because I always comply with the tasks that are assigned to me, if I do not finish something, it's because I didn't have time, or there was some setback, because I don't come to work to do nothing and waste time." ECF No. 43–5, at 2. She told Negrón on the same day that she did not have enough time for sign transmission because "the associates called her for something or she was doing other tasks." ECF No. 68–2, at 6. There were "many instances" where Ortiz would arrive at work, "find that Mr. Quiñones had not done tasks assigned," and "have to do the work he left undone from the previous day." ECF No. 51–2, ¶ 8. Negrón observed plaintiff working on her assigned tasks during work hours, but not wasting time. See ECF Nos. 35–1, ¶ 47; 51–1, ¶¶ 6.12–6.13, 6.15, 6.17, 49; 63–1, ¶¶ 6.12–6.13, 6.15, 6.17.

## F. New Medical Note

By March 23, 2010, plaintiff was feeling "extremely stressed," distracted, and nervous because of Negrón's treatment of her. ECF No. 51–2, ¶ 15. That same day, Ortiz checked her blood sugar level at work and it was over 400. She told Negrón that her blood sugar level was "extremely high" and she had to leave. ECF No. 43–1, at 41. Negrón responded, but the content of such response is disputed.[7] See ECF Nos. 35–1, ¶ 48; 51–1, ¶¶ 7.1–7.2, 7.20, 50; 63–1, ¶¶ 7.1–7.2, 7.20.

In order to attend to her medical situation, plaintiff went to the office of her physician, Dr. Joseph Campos ("Dr. Campos"), who had been treating plaintiff since January of 2009. At that time, plaintiff's diabetes mellitus was uncontrolled. She complained of increased thirst (polydipsia) and frequent urination (polyuria), which resulted in more frequent visits to the restroom. See ECF Nos. 51–1, ¶¶ 7.3–7.4; 63–1, ¶¶ 7.3–7.4.

Ortiz reported to Dr. Campos that she had been under a lot of stress at work and had not been eating. She indicated that on "many occasions" she was not given time to take her snacks at work, comply with her diet, or measure her blood sugar

---

7. According to plaintiff, Negrón "got upset" and made a face indicating that she did not believe her. ECF No. 58–1, at 38–39. Plaintiff showed Negrón the glucometer and stated, "[L]ook, here is the high sugar." Id. at 39. Negrón did not, however, indicate that plaintiff could not leave. Id. According to Negrón, plaintiff told her that "she felt bad," that "[her] sugar [wa]s bad," and that, if Negrón wanted, plaintiff would show her the glucometer. ECF No. 43–4, at 22. Negrón "told her that that was not necessary, to fill in the pass and go," and that, "if she had any need, or the doctor recommended something that had to do with her health, like having a lunch box in ... inside the office, or that she had snack at certain times, to let [Negrón] know after she went to the doctor." Id.

level. ECF No. 51–4, at 10. Plaintiff requested a medical certificate explaining her need for a reasonable accommodation in order to continue working. In response to Ortiz's request, Dr. Campos asked Dr. Melba Feliciano ("Dr. Feliciano") "for a recommendation" due to her expertise with diabetes. *Id.* at 7. Dr. Feliciano wrote the following:

> This is a 22–year old female with type 1 diabetes mellitus on insulin therapy and history of arterial hypertension on treatment. This patient due to her chronic condition of diabetes mellitus type 1 on insulin therapy and arterial hypertension as chronic complication of the disease needs a strict control of glycemia and arterial hypertension to prevent further complications. She needs a regular meal plan schedule according to insulin therapy and action profile, stressful events or chronic stress has been reported to contribute to uncontrolled glycemia. Reasonable accommodation with her present job assignment is recommended. Thanks for your attention.

*Id.* at 8; *see also id.* at 17–18; ECF No. 58–1, at 116; *see* ECF Nos. 51–1, ¶¶ 7.4–7.6, 7.8–7.9, 7.11; 63–1, ¶¶ 7.4–7.6, 7.8–7.9, 7.11.

Dr. Campos wrote a note which states, "Patient with diagnosis of DM type 1 which requires strict diet and blood sugar monitoring. Patient currently with uncontrolled blood sugar which requires special treatment and attention." ECF No. 35–

21. Plaintiff gave Dr. Campos's medical note to Negrón on her next day of work, March 25, 2010. *See* ECF Nos. 35–1, ¶ 50; 51–1, ¶¶ 7.10, 7.18, 52; 63–1, ¶¶ 7.10, 7.18.

Plaintiff submitted the sick leave request form for March 23, 2010, "two or three times because they had not paid [her] the sick hours, the remainder of hours [she] was going to work that day." ECF No. 58–1, at 52–53. She made the request "[t]o her, at Human Resources which is where the requests are done." *Id.* at 52. On April 9, 2010, plaintiff was paid for 2.05 hours of sick leave for the period between March 21 and April 3, 2010. *See* ECF Nos. 35–1, ¶ 49; 51–1, ¶¶ 5.17, 51; 63–1, ¶ 5.17.

### G. Final Day of Work

One of plaintiff's responsibilities as an Office Associate was the reconciliation of the store's cash registers. *See* ECF Nos. 43–1, at 10. The task, which occurred monthly, involved verifying that each cash register at the store had $100 in cash. When the task was conducted by an Office Associate, a supervisor, such as an assistant manager, the HR Lead, or an employee from the Loss Prevention Department, was usually present. This task was normally completed before the store opened at 9:00 a.m. and on the first Sunday or Monday of the fiscal month. *See* ECF Nos. 35–1, ¶¶ 25, 52; 51–1, ¶¶ 2.24–2.25, 8.2, 8.4, 8.12, 26, 54; 63–1, ¶¶ 2.24–2.25, 8.2, 8.4, 8.12.[8]

---

8. Plaintiff submits as a proposed fact that "[t]he reconciliation of the cash registers was the responsibility of management and not of a low-level office employee" and "was usually done by a manager or someone from the Loss Prevention Department." ECF No. 51–1, ¶ 2.25; *see also id.* ¶ 8.2. In support, plaintiff cites excerpts from Negrón's deposition. Within the cited excerpts, however, is the following exchange:

Q Can Jacqueline Ortiz or Ricardo do it without a supervisor being present?
A That was determined by Mr. Melvin Fonseca.
Q Okay. You, in your experience was there generally a supervisor or . . .
A Most of the time, either an assistant manager, a lead, or the one from Loss Prevention.
ECF No. 58–1, at 88. It is not a reasonable inference from this testimony that a manager,

On Monday, April 5, 2010, plaintiff was scheduled to work from 8:00 a.m. until 4:00 p.m. She arrived to work at 8:00 a.m. *See* ECF No. 35-10, at 29. On that day, Ortiz was assigned the task of reconciliation of the cash registers approximately one or two hours after she began work. *See* ECF No. 58-1, at 58. Ortiz was informed by management that she had to complete the task quickly. There were between ten and fifteen cash registers to reconcile. Because the store was already open, the task took Ortiz approximately one to two hours. *See* ECF Nos. 35-1, ¶¶ 53-54; 51-1, ¶¶ 2.24, 8.1, 8.9-8.11, 55-56; 63-1, ¶¶ 2.24, 8.1, 8.9-8.11.

Negrón began work at 7:00 a.m., two hours before the store opened. At 11:58 a.m., she left for lunch. *See* ECF No. 35-10, at 29. Negrón did not complete the reconciliation of the cash registers before lunch. By noon, plaintiff had been working for four hours. That day, she had not monitored her blood sugar levels between breakfast and lunchtime. She "was not able to measure [her] sugar" because management "wanted [her] to do [the reconciliation of the cash registers] fast." ECF No. 58-1, at 27. On that day, however, no one specifically told plaintiff that she could not measure her blood sugar level. *See*

ECF No. 43-1, at 32-33; *see* ECF Nos. 35-1, ¶¶ 55-56; 51-1, ¶¶ 8.5-8.8, 57-58; 63-1, ¶¶ 8.5-8.8.

At around 11:00 a.m., plaintiff began feeling sick and felt it necessary to measure her blood sugar level. She was trembling and had a headache, leading her to believe that her sugar was either very high or very low. By noon, Ortiz felt that she "had to go to lunch." ECF No. 58-1, at 27; *see* ECF Nos. 51-1, ¶¶ 8.13-8.14; 63-1, ¶¶ 8.13-8.14.

José Carmona ("Carmona"), a Sales Associate, requested that plaintiff provide change for a cash register. Plaintiff told him that she would give him the change and then go to lunch. She began heading downstairs with Carmona. Sometime after Negrón left for lunch, plaintiff encountered Fonseca. She told Fonseca that she was not feeling well, was shaking, "c[ould]n't take it anymore," and had to take her lunch break. ECF No. 58-1, at 59. She told him that she would finish the task upon her return and that there was not much work remaining. She told him "several times" that she was feeling bad, that it was already noon, that she had been working for three or four hours, and that she had to have lunch. *Id.* at 30. The content of Fonseca's responses to Ortiz's

---

a lead, or someone from Loss Prevention completed the task of reconciliation of the cash registers alone, without the assistance of an Office Associate. Rather, Negrón indicated that "[m]ost of the time" an Office Associate completed the task with a manager, a lead, or someone from Loss Prevention present. *Id.* Plaintiff's deposition testimony also does not support the proposition that the task of reconciliation of the cash registers was solely the responsibility of management. When asked whether reconciliation of the cash registers was "part of [her] usual tasks," plaintiff responded, "If it was assigned to me, that was part of the tasks of the supervisor, if it was assigned to me, well I have to do it with a supervisor or with a manager." ECF No. 43-1, at 70. In the context of being

asked" what her "functions as office assistant [*sic* ]" were, plaintiff responded first, "Well, we would do the vault." *Id.* at 9. Plaintiff later stated, "You would also tally the cash registers, that was done with the supervisor, if I was to do it, it had to be done with a supervisor." *Id.* at 10. Plaintiff also testified that, "ever since [she] started in Paseos, they told [her] that [the tally of the cash registers] was done with a supervisor." ECF No. 58-1, at 27. Nevertheless, it is contested whether, before April 5, 2010, a supervisor was present while reconciliation of the cash registers was being conducted by an Office Associate most or all of the time. *Compare* ECF Nos. 58-1, at 88; 68-4, at 3 (most of the time), *with* ECF Nos. 43-1, at 10, 30; 58-1, at 58 (all of the time).

concerns is contested.[9] *See* ECF Nos. 51–1, ¶¶ 8.15–8.21; 63–1, ¶¶ 8.15–8.21.

After plaintiff gave Carmona the change he requested, she accessed her personnel file to obtain her most recent medical certificate to show Fonseca. Plaintiff subsequently asked Fonseca why he had not permitted her to go to lunch even though he knew her medical condition. Fonseca told her that "he needed another person, a supervisor, a manager who was a woman" to be present. ECF No. 58–1, at 32. Ortiz brought Carmen Tañón ("Tañón") to see Fonseca, but he responded that it had to be with Negrón. *See* ECF Nos. 51–1, ¶¶ 8.25, 8.27–8.28; 63–1, ¶¶ 8.25, 8.27–8.28.[10]

After leaving at 12:23 p.m., *see* ECF No. 35–22, plaintiff drafted a handwritten letter of resignation in her mother's car. The letter reads as follows:

Attn. Melvin Fonseca

I hereby communicate to you my decision of terminating my job with Sears Los Paseos.

This responds to the intransigency and negative attitude of my superiors with regard to my job and my health condition. In addition, that my rights are being violated.

Effective today April 5, 2010.

/s/ Jacqueline Ortiz González

Enclosed Medical Certification

ECF No. 58–1, at 121. Plaintiff had no legal counsel assisting her at the time. Before returning to the store, plaintiff bought juice from Walgreens and drank it. After drinking the juice, plaintiff's blood sugar level was normal. *See* ECF Nos. 51–1, ¶¶ 8.20, 8.26, 8.31–8.32; 63–1, ¶¶ 8.20, 8.26, 8.31–8.32.

Plaintiff then returned to the store to deliver her letter of resignation. Plaintiff submitted the letter of resignation along with a copy of her recently submitted medical certificate. That day, April 5, 2010, was plaintiff's final day of work at Sears. The next day, plaintiff filed a Charge of Discrimination before the Anti–Discrimination Unit of the Puerto Rico Department of Labor. *See* ECF No. 43–12; *see* ECF Nos. 35–1, ¶¶ 61, 81; 51–1, ¶¶ 8.1, 8.31–8.32, 63, 83; 63–1, ¶¶ 8.1, 8.31–8.32.

## H. Vacation Liquidation Payment

Sears's payroll system requires "a complete period of inactivity of the associate for the system to have acknowledge [*sic*] that the associate is inactive and the system automatically then generates the liquidation." ECF No. 43–4, at 23. If the

**9.** According to plaintiff, during their exchange, each time she asked for permission to leave for lunch, he told her to go to lunch "when [she] finish[es] the job of the tally of the cash registers." ECF No. 58–1, at 31. Then, he indicated, "[W]ell, do whatever you want," and "kept on walking." *Id.* From "the other side of the elevator, at the sales floor," yelled to plaintiff, "[C]an't you even give him change?" *Id.* Carmona told Fonseca to "[t]ake it easy" because "she's talking to [Carmona]" and "she's not telling [Carmona] no." *Id.* at 31, 60. Fonseca's version of the story is different. According to him, he asked her, "Jacqueline, how much time does it take you perhaps to finish those two small registers?" ECF No. 68–4, at 4. She responded, "Ah, about ten or fifteen minutes." *Id.*

Fonseca stated, "Okay. You think you can complete . . . You know, can you complete the task?" *Id.* Plaintiff then told him, while raising her voice, "No! I have to go eat! I don't feel well." *Id.* at 4–5. Fonseca "raised [his] hands" because he "got frightened," and stated, "Bon appetit" ("Buen provecho" in Spanish). *Id.* at 5. In his deposition, Carmona denied having witnessed such an event. *See* ECF No. 68–5, at 3.

**10.** Although the proposed fact indicates that Tanon was "a female supervisor," ECF No. 51–1, ¶ 8.28, the testimony from Ortiz cited in support does not specify the same. *See* ECF No. 58–1, at 32.

system "has the correct address, the associate should receive [the liquidation pay] in four weeks, more or less." *Id.* at 25; *see* ECF Nos. 35–1, ¶ 75; 51–1, ¶ 77.[11]

On April 23, 2010, plaintiff was paid her last regular paycheck, corresponding to the pay period of April 4 to 17, 2010. The check corresponding to plaintiff's accrued vacation check was issued on May 7, 2010, and arrived at the Paseos Store on May 11, 2010. On May 13, 2010, Ortiz faxed Brenda Casanova, an employee of Sears, a letter indicating the address for the check to be sent. Plaintiff deposited the check on May 24, 2010. *See* ECF Nos. 35–1, ¶¶ 76–80; 51–1, ¶¶ 78–82.

## I. Sears Policies and Procedures on Employment Discrimination

While at Sears, plaintiff received training regarding company procedures. As part of plaintiff's Induction Training, which was conducted by Ayala, plaintiff was provided with a copy of Sears's Associates Manual and signed receipt of the same on November 11, 2005. *See* ECF No. 43–8; *see* ECF Nos. 35–1, ¶¶ 63–64; 51–1, ¶¶ 2–9, 65–66; 63–1, ¶ 2.9.

The Associates Manual includes a complaint procedure for employees who believe they are the victims of harassment. Under the procedure, an employee should explain the situation to the immediate supervisor. If the employee is not satisfied with the supervisor's response or is uncomfortable speaking with the supervisor, the employee should immediately contact the supervisor's manager or the human resources representatives. If the employee feels that insufficient attention has been given to the complaint or is uncomfortable speaking with somebody from the employ-

ee's own unit, the employee should call 1–888–88sears. *See* ECF No. 43–9, at 2; *see* ECF Nos. 35–1, ¶ 67; 51–1, ¶ 69.

As an employee of the HR Department, plaintiff was required to have knowledge of the policies against discrimination at Sears. Plaintiff was aware of the company's policy prohibiting harassment in the work place and the procedure for presenting a complaint, including the availability of a hotline. The company's computer training system assigns trainings depending on an employee's position. The system then generates a report for the trainings taken by the employee. The annual Training Schedule includes training on several topics, including policies and procedures. Plaintiff received Induction Training and training on Sears's Code of Conduct. Plaintiff, however, did not call the Human Resources hotline because she "did not feel confident" that it would remain confidential. ECF No. 43–1, at 75; *see* ECF Nos. 35–1, ¶¶ 68–69, 71–74; 51–1, ¶¶ 70–71, 73–76.

## II. LEGAL STANDARD

The purpose of summary judgment "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992). Summary judgment is granted when the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). " 'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it has the

---

11. None of the portions of the document titled "Unit Guide: Processing Final Pay for Hourly Associates" cited by plaintiff in her denial of proposed fact 75 contradict Neg-

rón's testimony, cited by defendants, regarding the system's treatment of liquidation pay. *See* ECF No. 51–1, ¶ 77 (citing ECF No. 35–27, at 5–7, 20–21, 26).

potential of determining the outcome of the litigation.'" *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 (1st Cir.2011) (quoting *Rodríguez–Rivera v. Federico Trilla Reg'l Hosp.*, 532 F.3d 28, 30 (1st Cir.2008)).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant presents a properly focused motion "averring 'an absence of evidence to support the nonmoving party's case[,]' [t]he burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990) (quoting *Garside v. Osco Drug., Inc.*, 895 F.2d 46, 48 (1st Cir.1990)). For issues where the nonmoving party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts" in the record "that demonstrate the existence of an authentic dispute." *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). The plaintiff need not, however, "rely on *uncontradicted* evidence .... So long as the plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling." *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.2004) (emphasis in original).

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan*, 904 F.2d at 115 (citations omitted). There is "no room for credibility determinations, no room for

the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood ...." *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). The court may, however, safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

## III. ANALYSIS

### A. Individual Liability under ADA and Law 44

The First Circuit "agree[s] with the virtually universal view that Title I of the ADA, like Title VII of the Civil Rights Act, 'addresses the conduct of employers only and does not impose liability on co-workers.'" *Román–Oliveras v. Puerto Rico Elec. Power Auth.*, 655 F.3d 43, 52 (1st Cir.2011) (quoting *Fantini v. Salem State Coll.*, 557 F.3d 22, 31 (1st Cir.2009) (internal quotation omitted)). With respect to Law 44, although "[t]he Puerto Rico Supreme Court has yet to rule on the question of individual liability under Law 44," "[c]ourts have consistently held that there is no individual liability under [the same]." *Cardona Román v. Univ. of Puerto Rico*, 799 F.Supp.2d 120, 131 (D.P.R.2011). Because neither Title I of the ADA nor Law 44 provides for individual liability, the claims against Negrón and Fonseca under said statutes should be dismissed.

### B. Failure–to–Promote and Retaliation Claims

Defendants argue that plaintiff failed to exhaust administrative remedies in connection with her failure-to-promote claim and that said claim is time-barred. ECF No. 36, at 5–6 (citing ECF No. 1,

¶¶ 4.9–4.11). In response, plaintiff contends that her failure-to-promote claim was "not present[ed] ... as a separate claim," but rather was "included ... only to provide a factual context for understanding the dynamics at the workplace once Negrón began to supervise plaintiff after receiving training from Ms. Ortiz ... and thereafter created an environment which was hostile to plaintiff's health needs." ECF No. 51, 7–8. "[I]ncidents apparently fall[ing] outside the limitations period ... can be used as 'background evidence' to support [plaintiffs'] timely claims." *Rodríguez v. Municipality of San Juan*, 659 F.3d 168, 177 n. 5 (1st Cir.2011) (First Amendment context). Such incidents "do[ ] not provide a basis for damages," but they "shed light on the impact of [defendants'] later [conduct]." *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 142 (1st Cir.2009) (context of antidiscrimination statutes, including ADA); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). As such, defendants' request to dismiss plaintiff's failure-to-promote claim should be found moot. Facts pertaining to an alleged failure to promote shall be analyzed, not as a separate claim, but, if relevant, within the context of plaintiff's other claims.

According to defendants, plaintiff is unable to establish a prima facie case of retaliation under the ADA. Nevertheless, plaintiff' states that she is "not raising a separate claim of retaliation." ECF No. 51, at 15. Thus, defendants' request to dismiss plaintiff's claim of retaliation should also be found moot. To the extent that evidence otherwise pertaining to a retaliation claim is relevant to the analysis of plaintiff's failure-to-accommodate, hostile work environment, and constructive discharge claims, it shall be analyzed within such contexts.

## C. Failure–to–Accommodate Claim

The definition of discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the] covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the [entity's] business." 42 U.S.C. § 12112(b)(5)(A). "Reasonable accommodation" includes "[m]odifications or adjustments ... to the manner or circumstances under which the position ... is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii). "A 'reasonable accommodation' is one which would enable the plaintiff to perform the essential functions of her job and at least on the face of things is feasible for the employer under the circumstances." *Mulloy v. Acushnet Co.*, 460 F.3d 141, 148 (1st Cir. 2006) (citing *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir.2001)). In order to survive a motion for summary judgment on a failure-to-accommodate claim under the ADA, " 'a plaintiff ordinarily must furnish significantly probative evidence that he is a qualified individual with a disability within the meaning of the applicable statute; that he works (or worked) for an employer whom the ADA covers; that the employer, despite knowing of the employee's physical or mental limitations, did not reasonably accommodate those limitations; and that the employer's failure to do so affected the terms, conditions, or privileges of the plaintiff's employment.' " *Gómez–González v. Rural Opportunities, Inc.*, 626 F.3d 654, 664 (1st Cir.2010).

Plaintiff has submitted evidence of her requests for accommodation. Evidence has been presented that plaintiff disclosed

her diabetes condition to Ayala on two occasions: during her pre-employment interview and when plaintiff began at the Paseos Store. On the first occasion, plaintiff explained that she needed to take breaks in order to monitor her blood sugar levels or ingest food, to leave if she felt ill, and "to eat at specific hours," but that her breaks would have to depend on her blood sugar level on any given day. ECF No. 51–3, at 9. Ayala told plaintiff about Sears's scheduled breaks and indicated that, if plaintiff needed more, she could talk with her manager, who would refer the issue to the "Human Resources Manager." *Id.* at 10. On the second occasion, plaintiff told Ayala, who then was her supervisor, about her need to monitor her blood sugar level, eat snacks if it was too low, and inject insulin, and how to proceed if she fainted. Plaintiff also told Negrón that she needed to take breaks to eat, check her blood sugar, and go to the restroom frequently. Fonseca was aware that plaintiff needed to monitor her blood sugar, administer insulin, and take breaks. The first medical certificate provided to Sears, dated October 31, 2005, indicates that plaintiff "requires eating at her times." ECF No. 43–3, at 1.[12] The second medical certificate, dated March 23, 2010,

states that plaintiff "requires strict diet and blood sugar monitoring" and that her "uncontrolled blood sugar . . . requires special treatment and attention." ECF No. 35–21.

In support of her contention that defendants failed to accommodate her disability, plaintiff presents evidence pertaining to "negative attitude" by Negrón or Fonseca, ECF No. 58–1, at 61, Negrón's following plaintiff to the restroom, the assignment of the task of sign transmission, reduction of plaintiff's hours, the PPI, and the alleged delays in processing payments relating to sick leave and vacation liquidation. Nevertheless, in the areas encompassed by plaintiff's requests for reasonable accommodation—using the restroom, measuring her blood sugar levels, and ingesting food—there is no evidence that, aside from April 5, 2010, plaintiff was ever prohibited from accomplishing such tasks. Plaintiff admits the proposed fact that "every time plaintiff had to go to the bathroom, measure her blood-sugar or do anything else related to her condition, she was, in fact able to do so." ECF Nos. 35–1, ¶ 60; 51–1, ¶ 62. Plaintiff also "admit[s] that that the only time that she was specifically prohibited from taking time to ingest food was on April 5, 2010." *Id.* ¶ 60.[13] As such,

---

12. Plaintiff also contends that she provided another medical certificate alongside the one dated October 31, 2005. No such medical certificate, however, appears in plaintiff's personnel file produced by defendants. *See* ECF Nos. 35–1, ¶ 5 n. 1; 51–1, ¶ 5. Plaintiff was unable to provide any identifying information about the doctor who issued said certificate, other than that it was "a lady doctor who was treating [her]," ECF No. 68–1, at 3, or to articulate with specificity the content of the same, *see* ECF No. 43–1, at 15–16, although she indicated that it was similar to the certificate dated March 23, 2010, *see* ECF Nos. 51–1, ¶ 2.6; 58–1, at 44. Nevertheless, because, for the reasons set forth herein, no reasonable jury can determine that defendants failed to accommodate plaintiff's disability, it is unnecessary to reach the question of whether plain-

tiff has submitted evidence sufficient for a jury to determine that such a medical certificate existed.

13. To the extent that plaintiff argues that defendants failed to accommodate her disability because she did not take breaks available pursuant to company policy because management "wanted [her] to do [her task] fast," ECF No. 58–1, at 27, such argument fails because plaintiff knew she was entitled to fifteen-minute breaks and was never prohibited from taking said breaks. ECF Nos. 35–1, ¶ 60; 51–1, ¶ 62; 51–3, at 10; *see Román–Basora v. Potter,* Civ. No. 08–1096(DRD), 2010 WL 5677118, at *11, *15 (D.P.R. Nov. 1, 2010) (holding that plaintiffs claim for reasonable accommodation on the basis of inability

while the facts outlined above may relate to a potential hostile work environment or constructive discharge claim, they do not constitute failures to provide accommodations requested by plaintiff. "[T]he alleged harassment is actionable under the ADA, but not under a 'reasonable accommodation' analysis." *Haysman v. Food Lion, Inc.*, 893 F.Supp. 1092, 1106 (S.D.Ga. 1995); *see also, e.g., Gunderson v. Neiman–Marcus Grp., Inc.*, 982 F.Supp. 1231, 1235 (N.D.Tex.1997) (analyzing evidence that plaintiff's superiors "questioned her regularly concerning her work restrictions ... in a less than cordial manner or ma[king] skeptical or sarcastic remarks in response to her answers" as a hostile work environment claim and finding no hostile work environment). It is not readily apparent that any of the aforementioned facts, taken as true, would constitute a failure to afford plaintiff with reasonable "[m]odifications or adjustments ... to the manner or circumstances under which [her] position ... is customarily performed, that [would] enable [plaintiff] to perform the essential functions of that position." 29 C.F.R. § 1630.2(*o*)(1)(ii). Thus, the only instance of an alleged failure to provide a reasonable accommodation occurred on April 5, 2010.

Ultimately, plaintiff's failure-to-accommodate claim should be dismissed because no reasonable jury can conclude that defendants failed to reasonably accommodate her disability on April 5, 2010. On what ended up being plaintiff's last day of work, sometime after 11:58 a.m., she and Fonseca engaged in a conversation wherein she requested "several times" to leave for lunch because she was not feeling well, indicating that she would finish her assigned task of reconciliation of the cash registers afterwards. ECF No. 58–1, at 30. According to plaintiff, Fonseca initially responded to her requests, "You are not going to lunch, when you finish balancing out the cash registers you can go." *Id.* at 59. Fonseca subsequently indicated, "[W]ell, do whatever you want," and left. *Id.* at 31. After giving Carmona change, accessing her personnel file, approaching Fonseca again in an attempt to converse, and bringing Tañón in another attempt to converse with Fonseca, plaintiff left. All of this took place over the course of twenty-five minutes or less. *See* ECF No. 35–10, at 29.

Plaintiff contends that "[i]t is certainly quite a leap ... to posit that th[e] evidence supports only one inference—that Ortiz was given permission to leave on lunch break." ECF No. 51, at 29. Nevertheless, plaintiff herself testified that Fonseca told her, "[W]ell, do whatever you want," and continued walking. ECF No. 58–1, at 31. Plaintiff subsequently left at 12:23 p.m. These facts clearly lead to the conclusion that Fonseca relented from his previous position allegedly prohibiting plaintiff from leaving for lunch.[14] It is not a reasonable inference that Fonseca continued to prohibit plaintiff from taking her lunch break. Even if Fonseca stated multiple times over the course of his conversation

---

to take breaks "fall from merit," where plaintiff told his supervisor that "he needed food breaks due to his diabetes," said supervisor "required plaintiff ... to deliver ... correspondence in a short period of time causing plaintiff not to dare to take any breaks during his shifts although he was entitled to do same," and, even though "he knew [he was] entitled to th[o]se breaks," he "failed to take the same"), *report and recommendation*

*adopted*, 2011 WL 292262 (D.P.R. Jan. 31, 2011).

14. To the extent that Fonseca may have done so with a hostile or otherwise negative attitude is relevant, as discussed above, in the context of a hostile work environment or constructive discharge claim, not a failure-to-accommodate claim.

with plaintiff that "[she] c[ould] go" to lunch "when [she] finish[ed] balancing out the cash registers," *id.* at 59, plaintiff's account of said conversation indicates that Fonseca no longer disallowed her from leaving by the end of the conversation. Within the very same exchange with plaintiff, Fonseca withdrew his prohibition on leaving for lunch.

Ultimately, plaintiff has not presented "cognizable and sufficiently strong" evidence, *Calero–Cerezo,* 355 F.3d at 19, that the exchange leading up to Fonseca's concession was an "unreasonable delay[ ] in identifying and implementing reasonable accommodations ... constitut[ing] a lack of good faith for purposes of the interactive process ...." *Crutcher v. Mobile Hous. Bd.,* Civ. No. 04–0499–WS–M, 2005 WL 2675207, at *12 (S.D.Ala. Oct. 20, 2005). Although an "unreasonable delay may amount to a failure to provide reasonable accommodations," *Valle–Arce v. Puerto Rico Ports Auth.,* 651 F.3d 190, 200 (1st Cir.2011), where an employer "effectively short-circuit[s] the interactive process," *Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urban Dev.,* 620 F.3d 62, 69 (1st Cir.2010), or "simply stonewall[s]" the process, *Calero–Cerezo,* 355 F.3d at 25, the record evidence in this case, as submitted to the court, does not permit a reasonable jury to conclude that such an unreasonable delay occurred here.[15] The uncontroverted evidence indicates that, over the course of the approximately five years that plaintiff worked for Sears, she was never denied a single request to use the restroom, measure her blood sugar level, take time to eat, or do anything else related to her condition, except that, on April 5, 2010, her lunch break was delayed no longer than twenty-five minutes.[16] Plaintiff has failed to present evidence such that a jury could conclude that a twenty-five-minute delay in taking her lunch break constituted an unreasonable course of action for purposes of the accommodation recommended by her physicians. *See* ECF Nos. 43–3, at 1; 35–21. Plaintiff was still permitted to "eat [her lunch] at her times," ECF No. 43–3, at 1, considering that she was able to leave for lunch at 12:23 p.m., within a half hour after she initially requested to leave—well within the one-hour period of time permitted by Sears for lunch breaks. Furthermore, plaintiff has provided no evidence that her condition was aggravated by the twenty-five-minute delay in taking her lunch break. Rather, it is uncontroverted that, after plaintiff drank juice, she measured her blood sugar level and it was normal. *See Edlund v. St. Anthony Med. Ctr.,* No. 00 C 50216, 2002 WL 596358, at *5 n. 2 (N.D.Ill. Apr. 16, 2002) (granting defendant's motion for summary judgment even where plaintiff presented evidence that, on eight different occasions, her supervisor "refused to allow her to immediately check her blood sugar level, but instead made her wait anywhere from five minutes to an hour to do so," because, *inter alia,* no reasonable inference could be made that "the delays caused her to

---

**15.** *Cf. Valle–Arce,* 651 F.3d at 201 (no dismissal of failure-to-accommodate claim in ADA case where, *inter alia,* defendant "delayed months after even the 2006 request" and where alleged accommodation "eventually granted was not what she sought and arguably did not reasonably accommodate [plaintiff]'s condition"); *Astralis Condo. Ass'n,* 620 F.3d at 68 (delay of "at least a year" in Fair Housing Amendments Act case); *Crutcher,* 2005 WL 2675207, at *12–13 (denying motion for summary judgment with respect to the provision of certain items over a year after plaintiff's request, but granting the same with respect to the provision of items within a month).

**16.** Plaintiff began speaking with Fonseca after Negrón left for lunch, which occurred at 11:58 a.m. *See* ECF No. 35–10, at 29. At 12:23 p.m., plaintiff left for lunch. *See id.*

experience hypoglycemic reactions" and plaintiff "ha[d] not pointed out any evidence showing the delays in checking her blood sugar level on those eight occasions affected her physically or in any way interfered with her ability to do her job"). Under such circumstances, no reasonable jury can determine that Fonseca failed to reasonably accommodate her disability on April 5, 2010.[17] Although his approach to the situation on April 5, 2010, may reflect a lack of prudence and constitute unprofessional or even rude conduct, it does not rise to the level of a failure to provide reasonable accommodation pursuant to the ADA.

Plaintiff also argues that Fonseca's refusal to communicate with her further about his refusal to let her go to lunch until Negrón was present constitutes a failure to engage in an interactive process with her as required by the ADA. Nevertheless, it is not a reasonable inference that Fonseca was fully refusing to discuss plaintiff's requests for accommodation, merely that he did not want to talk about it until Negrón was present. *See Gerton v. Verizon S. Inc.*, 145 Fed.Appx. 159, 168 (6th Cir.2005) ("[Plaintiff] has not cited any authority to support her argument that an employer must 'immediately' act on an accommodation request by an employee."). Plaintiff herself testified that Fonseca did not want to talk with her "at any time unless [Negrón] was there." ECF No. 58–1, 32. Moreover, as discussed above, plaintiff was eventually permitted to leave for lunch. Although, under certain circumstances, "it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the

accommodation" in order "[t]o determine the appropriate reasonable accommodation," 29 C.F.R. § 1630.2(*o* )(3), plaintiff on April 5, 2010, was indeed allowed the accommodation she requested. *See Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 109 (1st Cir.2005) ("This is not an instance where the employer ... simply rejected any request for accommodation without further discussion.... [Defendant] provided [plaintiff] with multiple accommodations."). Because no reasonable jury can determine that defendants failed to provide reasonable accommodation for plaintiff's disability, her failure-to-accommodate claim should be dismissed.

**D. Hostile Work Environment and Constructive Discharge Claims**

 At least five circuits recognize claims of hostile work environment as actionable under the ADA. *See Rodríguez–Fonseca v. Baxter Healthcare Corp. of Puerto Rico*, 899 F.Supp.2d 141, 152 (D.P.R.2012). In order to establish a claim of hostile work environment under the ADA, a plaintiff must prove the following: " '(1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.' " *Id.* (quoting *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001)). To establish a claim of constructive discharge, a plaintiff "must make a further showing ... that the abusive working environment became so intolerable

---

17. Moreover, no reasonable jury could find that Fonseca's request that, according to plaintiff, she "give [Carmona] change" before leaving for lunch constitutes a failure to accommodate, in light of plaintiff's testimony that Carmona subsequently told Fonseca that "she's not telling [Carmona] no" and that she had previously told Carmona that she would give him change before going to lunch. *See* ECF No. 58–1, at 31–32.

that her resignation qualified as a fitting response." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 134, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (Title VII context); *see also Méndez–Martínez v. Caribbean Alliance Ins. Co.,* 851 F.Supp.2d 336, 371 & n. 5 (D.P.R.2012). "Lest there be any doubt, the second standard sets the higher bar." *Dykstra v. First Student, Inc.,* 324 F.Supp.2d 54, 67 (D.Me.2004).

 Even if a plaintiff establishes prima facie cases of hostile work environment and constructive discharge, however, an employer may assert a defense under the *Faragher–Ellerth* doctrine. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).[18] "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Reed v. MBNA Mktg. Sys., Inc.,* 333 F.3d 27, 32 (1st Cir.2003). Summary judgment on these two elements is only appropriate where "no reasonable jury could decide [either of the issues] in the plaintiffs favor." *Id.* at 34.

██ Plaintiff makes two preliminary arguments against the applicability of the *Faragher–Ellerth* defense. First, plaintiff contends that an employer may not rely on the defense when "the offenders, themselves, are high-level supervisors whose conduct is plainly imputable to the company." ECF No. 51, at 13. In support, plaintiff cites the portion of *Faragher* which states that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." 524 U.S. at 807, 118 S.Ct. 2275. This, however, does not indicate that an employer is *automatically* subject to liability merely upon a finding that an employee has been subject to a hostile environment created by her supervisor. Rather, the *Faragher–Ellerth* defense applies precisely when there has been alleged harassment by a supervisor. *See Suders,* 542 U.S. at 143 & n. 6, 124 S.Ct. 2342 ("Our starting point is the framework *Ellerth* and *Faragher* established to govern employer liability for sexual harassment by *supervisors....Ellerth* and *Faragher* expressed no view on the employer liability standard for *co-worker* harassment." (emphasis added)). As such, the mere fact that the alleged harassers in this case retained supervisory authority over plaintiff does not preclude the application of the *Faragher–Ellerth* defense.[19]

---

**18.** Although *Faragher* and *Ellerth* both involved Title VII, not the ADA, plaintiff does not argue that the *Faragher–Ellerth* defense is inapplicable in ADA cases. The First Circuit appears not to have addressed the question. Nevertheless, the language of the ADA encompassing claims for hostile work environment has been "borrowed ... from Title VII." *Lanman v. Johnson Cnty., Kansas,* 393 F.3d 1151, 1155 (10th Cir.2004). "Congress' incorporation of this language into the ADA is indicative of its intent that the language mean the same in the ADA as it does in Title VII." *Id.*

As such, the *Faragher–Ellerth* defense is applicable here.

**19.** *Ellerth* mentions as a basis for employer liability an "agent's high rank in the company makes him or her the employer's alter ego." 524 U.S. at 758, 118 S.Ct. 2257. No evidence has been presented before the court which would permit a reasonable jury to find that either Negrón or Fonseca is an "alter ego" of Sears. *Cf. Johnson v. W.,* 218 F.3d 725, 730 (7th Cir.2000) ("*Faragher* suggests that the following officials may be treated as an employer's proxy: a president, owner, propri-

Second, plaintiff contends that the *Faragher–Ellerth* defense does not apply in this case because there has been a tangible employment action, in the form of plaintiff's alleged constructive discharge. "No affirmative defense is available ... when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275. A constructive discharge, however, "is not a per se 'tangible employment action.'" *Arrieta–Colón v. Wal–Mart Puerto Rico, Inc.*, 434 F.3d 75, 86 (1st Cir.2006); *see Suders*, 542 U.S. at 152, 124 S.Ct. 2342 (rejecting the proposition that the *Faragher–Ellerth* defense is "never available in constructive discharge cases"). A tangible employment action is "an 'official act,' that is, 'an employer-sanctioned adverse action officially changing [the employee's] employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which [the employee] would face unbearable working conditions.'" *Arrieta–Colón*, 434 F.3d at 87 (quoting *Suders*, 542 U.S. at 131, 134, 124 S.Ct. 2342); *see also Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257 ("A tangible employment action constitutes a significant change in employment status ....").

No evidence of such an official act has been brought to the attention of the court. For instance, plaintiff's PPI does not qualify as a tangible employment action. *See Conatzer v. Med. Prof'l Bldg. Servs. Corp.*, 95 Fed.Appx. 276, 280 (10th Cir.2004) (holding that a reprimand not "accompanied by suspension, loss or reduction of pay, or loss of benefits" did not constitute a tangible employment action for purposes of *Faragher–Ellerth* defense); *cf. Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 73 (1st Cir.2011) (holding reprimands without "any tangible consequences" not to be materially adverse actions in the context of a Title VII retaliation claim). Although plaintiff contends that she had to submit a sick leave request form "two or three times" with respect to her absence of 2.05 hours on March 23, 2010, ECF No. 58–1, at 52, she was indeed paid for 2.05 hours of sick leave for said day on the Friday following the end of the relevant pay period.[20] As such, no reasonable jury could conclude that she received an "extreme cut in pay" rising to the level of a tangible employment action. *Suders*, 542 U.S. at 134, 124 S.Ct. 2342. Similarly, no evidence has been presented indicating that any delay connected with plaintiff's liquidation pay following her resignation "exceeded that attributable to general workplace bureaucracy or administrative processing," particularly in light of Negrón's uncontroverted testimony regarding the processing of such payments within Sears's system. *Colón–Fontanez v. Municipality of San Juan*, 660 F.3d 17, 39 (1st Cir.2011). Nor does

---

etor, partner, corporate officer, or supervisor 'hold[ing] a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer.'" (quoting *Faragher*, 524 U.S. at 789–90, 118 S.Ct. 2275)).

**20.** Plaintiff's pay stub for the period of March 21 to April 3, 2010, does not specifically indicate that the payment of 2.05 hours corresponds with her absence of 2.05 hours on March 23, 2010. *See* ECF No. 35–20. Nevertheless, plaintiff does not dispute that she was, in fact, paid for 2.05 hours of sick leave on April 9, 2010. *See* ECF No. 51–1, ¶ 51. The parties have presented evidence of plaintiff's weekly schedule and her actual timecard statement for the two weeks which comprise the period of March 21 to April 3, 2010. *See* ECF No. 35–10, at 24–27. A comparison of the two demonstrates that, out of the eight days she worked during said period of time, only March 23, 2010, is consistent with the 2.05 hours of sick leave which plaintiff was paid.

the assignment of the task of sign transmission, transferred to the HR Department early in 2010, constitute a tangible employment action. Although the task of sign transmission was a new task for employees within the HR Department, no evidence has been presented that plaintiff's duties as a whole increased over the course of Negrón's tenure as HR Lead. *See Reinhold v. Com. of Va.*, 151 F.3d 172, 175 (4th Cir.1998) (finding the assignment of "extra work" not to constitute "a 'tangible employment action' "); *Loudermilk v. Stillwater Milling Co.*, 551 F.Supp.2d 1281, 1289 (N.D.Okla.2008) (holding that "assignment to various undesirable work tasks is not a 'tangible employment action,' " even where "unpleasant and perhaps unfairly imposed"); *cf. Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257 (providing "reassignment with *significantly* different responsibilities" (emphasis added) as an example of a tangible employment action).

The alleged decrease in plaintiff's hours in this case also does not constitute a tangible employment action. In support of her contention that her hours were reduced, plaintiff' selects as primary points of comparison the periods of January 3 to February 6, 2010, and February 14 and April 3, 2010. On average, plaintiff's weekly hours reduced from 16.6 to approximately 13.6. Nevertheless, no context has been provided regarding weekly schedules under previous supervisors. No evidence has been presented pertaining to the availability of the employee's primary coworker—Quiñones—over the same time periods. Moreover, no effect on the employee's other benefits has been shown. Under such circumstances, no reasonable jury cannot find that a reduction in an employee's average weekly schedule by approximately three hours constitutes a *significant* change in her employment status, particularly when the only schedules made available to the court indicate oft-fluctuating hours. *See Day v. Advance Stores Co., Inc.*, 1:09–CV–664, 2010 WL 1286666, at *7 (M.D.N.C. Mar. 29, 2010) (finding alleged harassment, including "reducing Plaintiff's hours," not to "rise to the level of tangible employment actions" for purposes of *Faragher–Ellerth* defense); *Taylor v. CSX Transp.*, 418 F.Supp.2d 1284, 1300 (M.D.Ala.2006) ("The court ... is not convinced that the change in her work schedule between October 16, 2003, the date she reported the harassment, and November 25, 2003, rises to the level of a tangible employment action."); *cf. Cham v. Station Operators, Inc.*, 685 F.3d 87, 94–95 (1st Cir.2012) (finding that a "loss of three shifts during the weeks encompassing Labor Day, Thanksgiving, and Christmas" and an additional "one-week reduction" in May were not adverse employment actions, particularly "in the context of a workplace where schedules fluctuate and no employee is entitled to any given shift").[21] None of the evidence presented by plaintiff in the instant case constitutes

---

**21.** Furthermore, no connection between the selection of the aforementioned two time periods and plaintiff's disability has been shown. Plaintiff argues that the two time periods are proper points of comparison because the task of sign transmission was first assigned to her in writing on February 9, 2010. Nevertheless, it is uncontested that the task of sign transmission was assigned to the HR Department "[i]nasmuch as the Marketing Department" was allocated a smaller weekly budget compared to the HR Department. ECF Nos. 35–1, ¶ 39; 51–1, ¶ 41. No causal relationship between the assignment of the task of sign transmission—undisputedly resulting from the disparity in department budgets—and plaintiff's disability has been shown. It is uncontested that plaintiff informed Negrón that she had diabetes when Negrón assumed the position of HR Lead, which occurred in December 2009. As such, it is not readily apparent the relevance of comparing the aforementioned two time periods.

a significant change in her employment status for purposes of the *Faragher–Ellerth* defense.

■ With respect to the merits of the *Faragher–Ellerth* defense, defendants contend that they have proven both elements. In this case, it is uncontested that Sears has an Associates Manual, which details a complaint procedure for employees who believe they are victims of harassment. *See* ECF No. 43–9, at 2. Plaintiff was provided with a copy of the Associates Manual and signed receipt of the same. She testified that, as an HR employee, she was required to have knowledge regarding Sears's policies against discrimination. She was aware of the company's policy prohibiting harassment, the complaint procedure, and the availability of a hotline.

The only record evidence presented for plaintiff's failure to engage Sears's complaint procedure is that she "did not feel confident" that it would remain confidential. ECF No. 43–1, at 75. Certainly, "[r]eporting . . . offensive conduct by a supervisor" may be "uncomfortable, scary or both." *Reed,* 333 F.3d at 35. Nevertheless, under "normal circumstances," an employee must "make this painful effort *if the employee wants to impose vicarious liability on the employer and collect damages under [the ADA].*" *Id.* (Title VII context) (emphasis in original). In other words, "more than ordinary fear or embarrassment is needed." *Id.* Here, plaintiff has presented no evidence of anything more than ordinary inconvenience and skepticism to explain her failure to pursue Sears's specified complaint procedure.

Plaintiff claims that she did not "unreasonably fail[ ] to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 32. Although the incident is contested, plaintiff testified that, sometime in 2010, she told Juan Medero ("Medero"), one of the store managers, that she "want[ed] to speak about [a concern] with [Fonseca]" and that she "want[ed] [Medero] to be present so that [he] c[ould] be aware of it." ECF No. 58–1, at 69.[22] She also told him about Negrón's "hostility towards [her]" and that Negrón "had reduced [her] hours on the job." ECF No. 51–2, f 14. Plaintiff told him, "Look, there's discomfort, there are attitudes, they're asking me to do a job that doesn't belong to my department." ECF No. 68–1, at 4. She also mentioned her PPL Medero told plaintiff that "there wasn't any problem" and that "he was going to be with [her] when [she] had to speak with [Fonseca]." *Id.* She asked Fonseca to meet, but "[they] never met." *Id.*[23]

■ As an initial matter, an employee need not follow a company's formal complaint procedure in order for a jury to conclude that she exercised reasonable care for purposes of the second element of the *Faragher–Ellerth* defense. *See Agusty–Reyes v. Dep't of Educ. of Puerto Rico,* 601 F.3d 45, 56 (1st Cir.2010) ("A jury could easily reject the [defendant]'s apparent position that no reports of harassment short of formal notice of sexual assault are sufficient to satisfy an employee's obligation under *Faragher–Ellerth's* second prong."); *see also Morales–Díaz v. Puerto Rico Elec. Power Auth.,*

---

22. It is uncontested that plaintiff also filed a Charge of Discrimination before the Anti–Discrimination Unit, but only after she had already resigned. *See* ECF No. 43–12.

23. Proposed fact 5.18 also states that, "despite repeated requests, Mr. Fonseca refused to meet with them to discuss the situation." ECF No. 51–1, ¶ 5.18. The record evidence cited for said proposed fact does not support such an assertion.

899 F.Supp.2d 170, 178 (D.P.R.2012); *Talavera–Ibarrondo v. Municipality of San Sebastian,* 824 F.Supp.2d 254, 262 (D.P.R. 2011); *but see Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 21 (1st Cir.2002) ("Th[e second] prong is usually addressed by proof that the plaintiff unreasonably ignored an established complaint procedure."). The issue is whether an employee has "ma[d]e 'reasonable' use of the reporting procedures provided by her employers." *Agusty–Reyes,* 601 F.3d at 56.

It is not necessary, however, to reach the question of whether plaintiff's conversation with Medero constitutes reasonable use of Sears's reporting procedures, because there is no evidence that said conversation involved plaintiff's disability. The ADA, like Title VII, "is neither a civility code nor a general anti-harassment code." *Lee–Crespo v. Schering–Plough Del Caribe Inc.,* 354 F.3d 34, 37 (1st Cir.2003). Plaintiff's testimony regarding her conversation with Medero—even if it is afforded full controlling weight—does not indicate that her "concern" about Fonseca, ECF No. 58-1, at 69, or "Negrón's hostility towards [plaintiff]," ECF No. 51-2, ¶ 14, were on the basis of disability—or any other protected category, for that matter. No evidence has been presented to the court that Medero was even aware that plaintiff had diabetes or any other condition. *Cf. Ortiz v. Hyatt Regency Cerromar Beach Hotel, Inc.,* 422 F.Supp.2d 336, 345 (D.P.R.2006) (finding that defendant "did not know nor had reason to know of the alleged harassment" where "even though [plaintiff] might have informed her supervisors of 'being bothered' she never outright complained of sexual harassment

to these supervisors until ... the eve of being transferred to the night shift").

Plaintiff lastly argues that "[i]t is ... obvious that with respect to the final incident—when Ortiz's life was literally in danger—filing an internal complaint at Sears would not have offered any relief." ECF No. 51, at 13. It is not readily apparent why this would be the case. Plaintiff has submitted no evidence that, after plaintiff drank juice and checked her blood sugar level on April 5, 2010, she could not initiate an internal complaint with Sears. In fact, it is uncontested that, on the very next day, she filed a complaint before the Anti–Discrimination Unit of the Puerto Rico Department of Labor. The factfinder has not been placed in a position to conclude that plaintiff was prevented from filing an internal complaint. Moreover, as discussed above, aside from plaintiff's "ordinary fear," *Reed,* 333 F.3d at 35, unsupported by any other record evidence, that a formal complaint would not remain confidential, there is no indication that a complaint concerning Fonseca's conduct would be futile or result in adverse consequences. *See id.* at 36 ("Claims of futility or adverse consequences have to be 'credible.'" (internal citation omitted)). Thus, as no reasonable jury could determine that defendants have not established both prongs of the *Faragher–Ellerth* defense, plaintiff's hostile work environment and constructive discharge claims should be dismissed.[24]

### E. Supplemental Claims

Plaintiff has also alleged claims of disability discrimination under Law 44 and wrongful discharge under Law

24. Plaintiff's informative motion brings to the attention of the court the case of *Kelley v. Corr. Med. Servs., Inc.,* 707 F.3d 108 (1st Cir.2013), which involved a claim of retaliation under the ADA, not claims of failure to accommodate, hostile work environment, or constructive discharge, claims which the instant plaintiff has alleged, nor does *Kelley* address the applicability of the *Faragher–Ellerth* defense.

80. Federal courts may decline to exercise supplemental jurisdiction over a plaintiff's state law claims when the federal claims that gave it original jurisdiction are dismissed. *See* 28 U.S.C. § 1367(c)(3); *González–De–Blasini v. Family Dept.*, 377 F.3d 81, 89 (1st Cir.2004); *Camelio v. Am. Fed'n.*, 137 F.3d 666, 672 (1st Cir.1998). If all federal claims are dismissed prior to trial, then the state law claims " 'should be dismissed as well.' " *Rodríguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Because federal question jurisdiction is alleged in this case, rather than diversity jurisdiction, *see* ECF No. 1, ¶¶ 2.1–2.4, plaintiff's claims under Puerto Rico law should be dismissed.

## IV. CONCLUSION

It is hereby recommended that defendants' motion for summary judgment (ECF No. 35) be **GRANTED**. Plaintiff's claims under the Americans with Disabilities Act with respect to all defendants, along with her claims under Puerto Rico Law 44 against defendants Melvin Fonseca and Melissa Negrón, should be **DISMISSED WITH PREJUDICE**. Plaintiff's remaining claims under Puerto Rico law, however, should be **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO RECOMMENDED.**

Pursuant to the order of the court (ECF No. 71), the parties have five (5) business days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this report and recommendation. Fed.R.Civ.P. 72(b)(2); Fed.R.Civ.P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir.

1994); *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986).

In San Juan, Puerto Rico, this 30th day of August, 2013.